1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF VIRGINIA
2    NEWPORT NEWS DIVISION


3


4    UNITED STATES OF AMERICA,        )
                                      )
5         Plaintiff,                  )
                                      )
6    v.                               )    Criminal Action No.:
                                      )         4:12cr28
7    MICHAEL JAY TUCKER,              )
                                      )
8         Defendant.                  )


9


10              TRANSCRIPT OF PROCEEDINGS

11        (Hearing on Motion for Reconsideration)

12
                    Newport News, Virginia
13                    April 26, 2013


14


15


16   BEFORE:      THE HONORABLE MARK S. DAVIS
                  United States District Judge
17


18


19   Appearances:

20        OFFICE OF THE UNITED STATES ATTORNEY
                  By: JONATHAN A. OPHARDT, ESQUIRE
21                    Counsel for the United States

22        PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
                  By: KEVIN M. DIAMONSTEIN, ESQUIRE
23                    Counsel for Defendant

24
          The Defendant appearing in person.
25

```
1                    P R O C E E D I N G S

2

3           (Proceedings commenced at 10:08 a.m. as follows:)

4

5           COURTROOM DEPUTY:  In Case No. 4:12cr28, United States

6  of America v. Michael J. Tucker.  Mr. Ophardt, is the government

7  ready to proceed?

8           MR. OPHARDT:  Yes, ma'am.

9           THE COURT:  Good morning, Mr. Ophardt.

10          MR. OPHARDT:  Good morning, sir.

11          THE COURT:  It is Ophardt or --

12          MR. OPHARDT:  Ophardt.

13          COURTROOM DEPUTY:  Mr. Diamonstein, is the defendant

14  ready to proceed?

15          MR. DIAMONSTEIN:  Defendant is ready to proceed.  Good

16  morning, Your Honor.

17          THE COURT:  Good morning, Mr. Diamonstein.

18          All right.  We of course are here because of letters

19  that the court has received and the motion that has been made,

20  specifically defendant's motion that is Document 100 filed on

21  April 15 of this year asking for a reassessment of the defendant

22  for sanity at the time of the offense.  So let's sort of review

23  to see how we got here, and think I that might be helpful for

24  everyone.

25          On March 14th of last year, 2012, Mr. Tucker and two
```

1   others were indicted in a six-count indictment charging them

2   with conspiracy to obstruct, delay and affect commerce by

3   robbery, that was Count 1, and three counts of obstruct, delay

4   and affecting of commerce by robbery, and two counts of using,

5   carrying and possessing a firearm in relation to a crime of

6   violence.  These involved or stemmed from three robberies, one

7   at the Happy Shopper in Hampton on January 22nd, 2012, one at

8   the One Stop Food Mart in Newport News on January 23rd, 2012 and

9   one at the Hardee's in Hampton on January 23rd, 2012.

10  Mr. Tucker was arrested pursuant to an arrest warrant on

11  April 27, 2012.

12          On May 14, 2012 Mr. Tucker filed notice of his intent

13  to rely on the insanity defense and to present expert testimony

14  concerning his mental condition and on May 16th, defendant filed

15  a motion for a psychiatric exam to determine competency.  The

16  court issued an order granting that motion on May 17, 24 and on

17  May 29th the court ordered that Mr. Tucker be committed to the

18  custody of the Attorney General for placement in a suitable

19  facility for a reasonable period of time to conduct an

20  examination to determine, one, whether Mr. Tucker was insane at

21  the time of the violations charged in the indictment, and two,

22  whether Mr. Tucker may presently be suffering from a mental

23  illness, disease or defect rendering him mentally incompetent.

24          On May 23rd, 2012, defense counsel moved to continue

25  the trial pending the outcome of the court's competency

1  determination and the court did continue that trial.

2  Then the court received the ordered mental health

3  evaluation on August 22nd, 2012, and that's ECF No. 37.  The

4  forensic report concluded that Mr. Tucker met the criteria for a

5  diagnosis of borderline personality disorder, and that based on

6  his self-reported history, that he may also meet the criteria

7  for a diagnosis of post-traumatic stress disorder, although the

8  evaluators were unable to confirm or disconfirm that later

9  diagnosis.

10  Report further found that Mr. Tucker has an adequate

11  rational and factual understanding of the charges against him

12  and the legal process as it relates to his specific situation,

13  that he seemed willing to work with his current attorney, and

14  that he is competent to proceed and will remain competent in the

15  foreseeable future.  Of course there was a forensic addendum

16  that was attached to that.

17  The addendum concluded that the final opinion

18  regarding criminal responsibility was a matter for the trier of

19  fact.

20  We came back on October 1st, 2012 and held a

21  competency finding hearing.  After reviewing the report at

22  length, I determined that Mr. Tucker was competent and capable

23  of proceeding to trial and assisting his attorney in this case,

24  and I reserved the issue of sanity for trial, since such a

25  notice had been given.

1              Then on December 20, 2012, the court entered an order

2  authorizing a magistrate judge to conduct guilty plea

3  proceedings, and on January 3, 2013, about three months after

4  the defendant's competency hearing, he requested and consented

5  to Magistrate Judge Douglas Miller conducting the guilty plea

6  proceedings and he pled guilty to two counts of the indictment,

7  Count 4, brandishing a firearm during a crime of violence and

8  Count 6, brandishing a firearm during a crime of violence.

9  Judge Miller accepted the guilty plea and the matter was

10 continued for sentencing.

11             Then Mr. Tucker sent two letters to the court.  One

12 was received on March 6th, 2013 and a second was March 17th,

13 2013.  The letters complained that Mr. Tucker had been

14 physically abused while incarcerated, including several beatings

15 that allegedly occurred at the Bureau of Prisons facility in

16 Missouri where was evaluated.  And also stated that he was being

17 denied food.  He also complained that his competency and sanity

18 evaluation was not accurate and that his attorney had not been

19 as responsive to his complaints as he would have liked regarding

20 his treatment or the evaluation.

21             The primary complaint is difficult to discern, and so

22 I did not treat these letters as any kind of request for new

23 counsel, but it may be something that we want to delve into

24 today to make sure we're clear about what is being requested.

25             Mr. Tucker's sentencing was then set for today, and a

1   presentence report was prepared in the case, and Ms. Weaver is

2   here with us, having prepared that.  I do have that.

3          On April 8th, Mr. Turner prepared -- or filed his

4   position on sentencing indicating no objections.  And then on

5   April 15th, a week later, Mr. Turner's counsel filed a motion to

6   reassess the sanity, which I've already referred to.  In that,

7   Mr. Tucker's claiming that the evaluators failed to follow up

8   with his biological or adoptive parents and failed to obtain

9   records from two medical centers.  Mr. Tucker contends that had

10  the evaluators followed up on his self-reported history, they

11  would have been able to reach a more informed and educated

12  conclusion regarding his sanity at the time of the offense.  Mr.

13  Tucker notes also that in preparing the presentence report, the

14  probation officer was able to contact his brother and verify his

15  family background and history of abuse, which information Mr.

16  Tucker argues could have impacted the evaluators' conclusions if

17  they had endeavored to obtain it.  Mr. Tucker asked the court

18  that he be reassessed for sanity at the time of the conduct.

19          There's no challenge to the competency finding at this

20  time, which of course the court did not -- well, I should say

21  the conclusions concerning sanity at the time of the offense,

22  the court of course did not delve into indicating that was

23  for -- at the time we thought that the matter was going to

24  trial, and indicating that was a matter for trial.

25          The government has filed an opposition in which they

1  argue that Mr. Tucker should not be allowed to withdraw his

2  guilty plea and pursue an insanity offense because the forensic

3  report and the addendum clearly state that Mr. Tucker understood

4  the nature and of his actions, and even if he's suffering from

5  some serious mental disease or defect, he would not qualify for

6  the insanity defense.

7          So Mr. Diamonstein, let me hear from you on your

8  motion.

9          MR. DIAMONSTEIN:  Yes, sir.

10          THE COURT:  I guess one of the questions I have here

11  with that summary is didn't the evaluators assume -- I mean,

12  based upon his own self-reporting, they took his self-reporting

13  and credited it, didn't they?  So what is to be gained from

14  more?

15          MR. DIAMONSTEIN:  Judge, obviously when -- I'm not a

16  psychologist or psychiatrist, and then the, when you're talking

17  about the relying on self-reporting information to the

18  evaluators and then not following up on some critical things

19  that may or may not have been helpful or assist them in making a

20  judgment.  I would analogize this to going to if you had broken

21  your leg and go into the doctor and they didn't do an X-ray on

22  it but then, and then just saying, well, we think this is the

23  problem so we will make a, make a diagnosis of a sprain versus a

24  broken leg.  And when we're talking about mental health issues,

25  psychiatric records, things that are a lot more difficult to

```
 1   ascertain, and it requires, I think, a lot more investigative

 2   work to determine the person's background in making a decision,

 3   A, of competency, or B, sanity at the time of the offense.  Had

 4   it not been for some of the information that Ms. Weaver was able

 5   to pull out and place in the presentence report, very helpful

 6   information that I think could have assisted the evaluators in

 7   Missouri when he was taken there, to maybe gain more access and

 8   get information that could have helped them make a more informed

 9   decision about his competency and/or sanity.

10          THE COURT:  Isn't the better analogy that you go to

11   the doctor or the emergency room and you say I've broken my leg,

12   and they say -- they don't do the X-ray, they say yeah, looks

13   like you've broken your leg, we're going to treat you as if

14   you've broken your leg?  It looks like to me that's, you know,

15   more in keeping with what we have here.  They credited Mr.

16   Tucker's self-reporting of the things that had happened to him

17   in his background, in his life and took it, I think, at face

18   value in reaching their conclusions.  Now, had they done the

19   things that Ms. Weaver had done or been successful in speaking

20   to these people, it would have confirmed what he had

21   self-reported.  But I guess you're asking me to send him back

22   for further evaluation and I'm trying to figure out --

23          MR. DIAMONSTEIN:  Well --

24          THE COURT:  -- what's the potential difference.

25          MR. DIAMONSTEIN:  Well, I would say that coupled with
```

```
 1    the information that Ms. Weaver has gotten and contact

 2    information relative to that and -- and certainly I think this

 3    needs to be done, but I don't know that going back to Missouri

 4    is an option for him in light of some of the things contained in

 5    the correspondences the court and I have received about his

 6    treatment in these facilities, which is very concerning.  So I,

 7    out of an abundance of caution I do believe at the very -- when

 8    you looking at the severity, because in this case there's

 9    mandatory minimums of 32 years that he's facing, and obviously

10    in the interests of justice and fairness, be something that I

11    think it should be looked into and at least confirmed with not

12    only the court, my client and the government, to assure that Mr.

13    Tucker was aware and knew right from wrong at the time these

14    offenses were initiated.

15            He had a lot of difficulty when he was in this

16    facility in Missouri, according to the letters and things that

17    I've received, and I don't know whether or not that necessarily

18    also impacted their judgments in making the evaluations of him.

19    I can only surmise if he has these types of feelings towards

20    these people, that he may not have been as forthcoming in

21    answering certain things because of his, the treatment that he

22    was receiving.

23            THE COURT:  Let me ask you this.  The government

24    seems -- I think has offered up the possibility of having the

25    evaluator available by telephone today.  And so what is your
```

1  position on whether that evaluator should be asked via telephone

2  whether this additional information would have impacted the

3  conclusions?

4          MR. DIAMONSTEIN:  Well, sir, I, if Your Honor please,

5  I don't -- my position is going to stand, that he needs to get

6  reassessed.  They can't, there's no -- they have already done

7  their, the assessment on Mr. Tucker.  So whatever information

8  they have had or lack thereof, they can't make any further -- I

9  mean, they're going to stand on whatever conclusions that they

10 made, and I'm sure they're going to say that these are

11 sufficient.

12         THE COURT:  How do you know that?

13         MR. DIAMONSTEIN:  Well, I mean, those are the, in the

14 reports, and that's --

15         THE COURT:  And I'm saying if they're asked what would

16 this new information have done to your opinion, you're just

17 assuming they're not going to --

18         MR. DIAMONSTEIN:  Well, I mean --

19         THE COURT:  -- answer truthfully?

20         MR. DIAMONSTEIN:  I have no problem with getting them

21 on the phone and asking them.  That's not a problem.  But you

22 know, that's -- and then we can ask them questions there.  I

23 have no problem with that.  I don't think that, you know -- I

24 don't have any issue with that.  If the court wants to get them

25 on the phone and question them about that, that's, I have no

1  problem with doing that.

2          THE COURT:  Okay.  I think I understand the issues

3  that you have.  And so go ahead, was there anything else?

4          MR. DIAMONSTEIN:  And part of this, this case has been

5  going on since 2012, and the, I only brought with me today a

6  capsulization of a file that I have, and I can tell you in

7  between from the beginning to where we are today there's been a

8  lot of ups and downs and tops and turveys in terms of how the

9  case has gone and whether the client was pleased with something

10 or not pleased with something.  And so I've done the best I can

11 to try to represent him to the best of my ability to try to

12 safeguard every interest for him, which is, and given some of

13 the contents of the letters that I have received and the court

14 has received, I'm concerned about his well being, I'm concerned

15 about his mental status.  All things that are important.  And I

16 think -- and we're talking about one individual here, because

17 this is the focus of this hearing, is my client, Mr. Tucker.

18 And out of an abundance of caution I think sometimes that we

19 have to take a second look at the defendant to determine whether

20 or not the original report could be just relied upon in and of

21 itself without -- the evaluators don't, aren't, weren't privy to

22 a lot of the things that have occurred during the course of this

23 case going on.  We're talking like March of last year, now we're

24 April of, over a year later.  So a lot -- and they just

25 capsulized this investigation in roughly June 26 to some late

1   part of July.  So a very small capsulation of time in terms of

2   evaluating him with the limited information that they had.  And

3   I and the court and the government have been able, have had the

4   case for going on over a year.  So if you look at all these

5   other things that are associated with the case, I think those

6   are things that, input that a second opinion may, may or may not

7   affect that decision.  I have no idea.  But certainly it

8   couldn't help in the ends of justice, in knowing what the

9   consequences are at the end of the road here for Mr. Tucker, I

10  think it would be, behoove the court and be in the interest of

11  justice and fairness to have it reassessed.  I don't believe

12  that it's going to take that long a time frame to do that

13  component of it.  And so out of an abundance of caution I think

14  it should be done.

15          I mean, it's easy for us to sit here and say, okay,

16  this report that was done and it seems to be adequate, but --

17  and I use the word "adequate", and that's -- I don't know, I

18  don't think that something that, in the -- when we're talking

19  about a human being and their freedom being taken away from them

20  for that lengthy period of time should be taken lightly.  And I

21  think it would be in the interest of justice to have this done,

22  and then it would at least -- once we, if we -- if the court

23  considered doing that, at least we can know in our hearts and

24  our minds and for justice that we did the right thing to make

25  sure that the scales of justice are equal and everybody knows

1  what my client is suffering from and whether that meets the

2  criteria or not.

3          THE COURT:  Well, what are you asking me to do about

4  the guilty plea?  He's already come in and pled guilty.

5          MR. DIAMONSTEIN:  I understand.  The court has not,

6  obviously has not, has not accepted the guilty plea, which is at

7  this point in time was taken by the magistrate.  I would, I

8  would ask that this, this assessment be redone and then get that

9  back and then make a determination about what the results are,

10 and then we can make a decision about how we're going to go

11 forward from there.

12         THE COURT:  Okay.

13         MR. DIAMONSTEIN:  And I think that would be the fair

14 and judicious way to handle it, and would also ensure that his

15 rights -- and based on my experience with him and the

16 correspondences that are concerning to me and I'm sure

17 concerning to the court, out of an abundance of caution that he

18 should be reassessed for this to make sure that he knew right

19 from wrong at the time these offenses were committed.

20         THE COURT:  Okay.  I understand.

21         MR. DIAMONSTEIN:  Thank you.

22         THE COURT:  Thank you, Mr. Diamonstein.

23         Mr. Ophardt.  Mr. Ophardt, are you a special assistant

24 new to the office?

25         MR. OPHARDT:  Yes, Your Honor.  I'm a special

1   Assistant United States Attorney.  I'm a trial attorney with the

2   Organized Crime and Gang Section in DOJ.  I'll be down here for

3   three months, so hopefully you'll get to know my face.  And I

4   took over most of Rebecca Staton's cases.  She's from the same

5   office in D.C.

6              THE COURT:  Okay.  Very good.

7              MR. OPHARDT:  Your Honor, I believe that I'm a little

8   befuddled just because a lot of our discussion today has been

9   whether or not Mr. Tucker is suffering from a mental disease or

10  defect and whether that's sufficiently captured in the report.

11  I really don't think that is the crux of the issue here.  The

12  government would concede that he has a mental disease or defect.

13  We wouldn't concede that it's severe for 18 United States Code §

14  17.  That is actually a question for the fact, finder of fact.

15             In addition, it's a question for the finder of fact

16  whether or not he was able to understand and appreciate the

17  nature and quality or wrongfulness of his actions.  I think that

18  the severity question might be debatable, but I think that the

19  appreciation question is a foregone conclusion.  And if we're

20  looking at whether or not this defense would even be presented

21  to the jury, this court could actually prevent that if it found

22  that all of the indications are that he, despite any mental

23  defect, as severe as it might be, he knew what he was doing.  So

24  the --

25             THE COURT:  But you isn't, isn't the big issue the

```
1    competency to make a decision about --

2              MR. OPHARDT:  Pleading guilty.

3              THE COURT:  -- whether he's going to plead guilty

4    and -- I mean --

5              MR. OPHARDT:  Your Honor, I didn't understand the

6    motion to be attacking competency.  And if that is the issue,

7    I -- I don't believe, I believe he is competent.  And I believe

8    that the report as Your Honor stated adequately assumed the

9    facts which the PSR -- I think the only one that may not is

10   perhaps fetal alcohol syndrome.  I don't know if that one was

11   necessarily mentioned in the report.  But nonetheless, Your

12   Honor's correct:  I think the competency would be a much bigger

13   concern if we're just talking about the severity of the mental

14   illness of Mr. Tucker.  But if we're talking about a sanity at

15   the time of the offense, I think the report is more than

16   adequate and outlines Mr. Tucker's self-reporting of the offense

17   of conduct with plenty of indications that he knew that his

18   conduct was wrong.  The statement of facts also includes plenty

19   of indications he knew his conduct was wrong.  His admissions to

20   defendants in his post-arrest interview also include plenty of

21   admissions that he knew his conduct was wrong.  His admissions

22   to his brother between the robberies are indicative.  His flight

23   to Ohio, whether or not that was flight from law enforcement or

24   flight from his co-conspirator, whether it was flight from his

25   co-conspirator or whether it was a flight from law enforcement,
```

1  is indicative that he knew this conduct was wrong.  He mentions

2  that his co-conspirator wanted to rob a bank and he wasn't in

3  for that, and the next day he's in Ohio.  I think that is

4  indicative of him, his knowledge that his conduct was wrong.

5          So if this is a question of competency, Your Honor,

6  perhaps the, it makes a little more sense, but I still don't

7  think that that undermines the report's conclusions of his

8  ability to interact with his attorney, which he's done; I think

9  the letter to his attorney underscores his ability to comprehend

10  the legal system, underscores his ability to interact with his

11  attorney, his expectations for his attorney, his understanding

12  of the legal process.  And to be bluntly honest, Your Honor, I

13  think this is an instance of knowing 32 years is a long time.

14  And I think that it's time that, that we proceed with

15  sentencing, and an additional mental evaluation isn't required.

16          If this was a question for mental evaluation to try to

17  put on a motion for a departure under the guidelines for

18  diminished capacity or 3553(a) nature and circumstance of the

19  offender question, to truly understand the depth of his mental

20  illness perhaps it might be warranted.  But as the court is

21  aware, there's mandatory minimums in this case.  There will be

22  no grounds for a variance or departure below the 32 years.  I

23  just don't see the benefit to having an additional mental health

24  analysis.  BOP will assess him when he enters BOP custody again.

25  He can be placed in a mental health facility whether it be at

1   Butner or Springfield and they can guide his treatment

2   accordingly.  I just, I don't see the necessity for the expense

3   at this point in time.  I think we do need to view this through

4   the lens of withdrawal of the guilty plea, whether there's a

5   fair and just reason for such a withdrawal.

6           THE COURT:  Let me talk to you about the challenge as

7   I understand it.  The addendum addressing sanity.

8           MR. OPHARDT:  Yes, Your Honor.

9           THE COURT:  -- concludes that Mr. Tucker was sane at

10  the time of the offense both because, one, he was not suffering

11  from a severe mental disease or defect at the time of the

12  offenses despite the diagnoses of the mental health issues, and

13  two, that he clearly understood the nature and quality of his

14  acts and the fact that committing the acts of robbery was wrong.

15  And it seems that he's challenging that first finding; that is,

16  that in failing to verify his self-reported abuse and mental

17  health history, the evaluators failed to diagnosis him with a

18  severe mental disease or defect.  And there's no challenge to

19  the second conclusion, it seems, at this point.  But again, the

20  evaluators may not have, for whatever reason, verified the

21  self-reported history that Mr. Tucker gave, accepted it, as I

22  said earlier, and then concluded that regardless his diagnoses,

23  he understood the nature and quality and wrongfulness of his

24  objections.  And so as you can tell from my questions of Mr.

25  Diamonstein, if they assumed that, what difference does it make

1   if they confirm what they already assumed to be the result?

2          MR. OPHARDT:  I absolutely agree, Your Honor.  I don't

3   know how big of an impact it would have to simply have

4   verification rather than an assumption.  But my, I think the

5   clearer point -- the way I understand the insanity defense, both

6   elements are crucial.  You can't have innocent by reason of

7   insanity finding without both elements.  And if we were not

8   contesting element No. 2 that whatever mental disease and defect

9   didn't interfere with his ability to know right from wrong at

10  the time of the offense, then the question of severity is

11  superficial.  It's really irrelevant to a question of guilt.  It

12  might be relevant to treatment, it might be relevant to

13  sentencing if this wasn't a mandatory minimum case.  But his, we

14  could assume that he was hearing voices and psychotic and

15  bipolar and the worst psychological conditions, but if he knew

16  what he was doing in that moment, the mental disease is

17  irrelevant.  Because both prongs are an absolute requirement for

18  a legal finding of insanity at the time of the offense.

19          THE COURT:  Do you have the evaluators, one of them

20  available by telephone?

21          MR. OPHARDT:  I don't have her currently on the phone.

22  I believe I sent Ms. Ward her phone number.  She is --

23          THE COURT:  Does she know to be available?

24          MR. OPHARDT:  Yes, sir.  I told her the hearing was at

25  10:00.  I can't quite read the clock.  I would hope she's still

```
 1   available.

 2              THE COURT:  10:42.

 3              MR. OPHARDT:  If you would like to talk to her she

 4   said she was willing.

 5              THE COURT:  Is that Dr. Pietz?

 6              MR. OPHARDT:  Yes, Your Honor.

 7              THE COURT:  Pietz.

 8              MR. OPHARDT:  Christina Pietz.

 9              THE COURT:  All right.  Mister -- okay.  Thank you.

10              Mr. Diamonstein?  What about this, the two-part

11   analysis?

12              MR. DIAMONSTEIN:  Judge, if Your Honor please, yes,

13   there is a two-part analysis about does the defendant suffer

14   from a severe mental disease or defect, and two, does he, as a

15   result of the mental disease or defect, was he unable to

16   appreciate the nature and quality of the wrongfulness of his

17   acts.  Those are the two prongs of the test that are necessary.

18              THE COURT:  Are you challenging the second one?

19              MR. DIAMONSTEIN:  Judge, I don't -- I guess I'd have

20   to say I would be, because I don't believe that the evaluators,

21   without having all the proper background information on the

22   defendant and making conclusions that are not verified or

23   unsupported, or additionally, additional information that could

24   have been provided to them that the probation office had access

25   to that they for whatever reason didn't bother to inquire about,
```

1   my main focus is to make sure that they take a second look at

2   this just to be sure that he does not fall within the, these two

3   parameters.

4           THE COURT:  Okay.  Well, why don't we get Dr. Pietz on

5   the phone and we'll ask some questions.  Mr. Ophardt, do you

6   think she's kind of, based upon your interaction with her,

7   brought herself up to speed on this matter?

8           MR. OPHARDT:  Your Honor, I did not -- I didn't feel

9   comfortable sending her a copy of the PSR which had the

10  additional information.  I tried to regurgitate it.  She did

11  email me back saying that without reading the actual reports and

12  speaking to the actual people that probation spoke to, it's hard

13  for her to speculate without the underlying source material.

14  But she said it is such a high standard that it was unlikely

15  that the material would effect -- I think unlikely was her

16  word -- but I did want to let the court know she hasn't seen

17  anything new.

18          THE COURT:  Let's be clear about what this information

19  is.  What is the new information, Mr. Diamonstein?  What is it

20  that you contend that Ms. Weaver unearthed that you say would

21  potentially have made a difference to the evaluators that the

22  evaluator had not found?  Is it all in your memorandum?

23          MR. DIAMONSTEIN:  Judge, I listed it, just let me --

24  because I have the presentence report side by side with what...

25          Of course the information that they used according to

1    their report to make these determinations were --

2              THE COURT:  Is that in 1 through 7 in your document?

3              MR. DIAMONSTEIN:  That is correct.

4              THE COURT:  Okay.  Let's not read all of those.

5              MR. DIAMONSTEIN:  Okay.

6              THE COURT:  Then you say "After that, the evaluators

7    did not contact the biological mother, Pam walker, or Clyde

8    Coley, the biological father, or the adoptive parents, Crystal

9    or Johnny Tucker, to confirm the defendant's physical abuse

10   and/or prior mental health history.  So is that the first one?

11             MR. DIAMONSTEIN:  That's correct.

12             THE COURT:  Okay.  Second.  "No records were retrieved

13   from Hershey Medical Center wherein the defendant attempted

14   suicide at age seven or from Maryview Medical Center where he

15   was treated at the age of 12.  Is that the second?

16             MR. DIAMONSTEIN:  That's correct.

17             THE COURT:  Then you say "The defendant self-reported

18   to the evaluator that he had received a diagnosis of PTSD, fetal

19   alcohol syndrome, personality disorder dipolar, schizophrenia

20   and reattachment disorder, and was treated with a multitude of

21   psychotropic medications."  So that was a self-reporting to the

22   evaluator.  And that "Also he reported he'd suffered a long

23   history of physical and sexual abuse which was followed up on --

24             MR. DIAMONSTEIN:  Was not followed up on.

25             THE COURT:  Was not followed up on or verified with

1  family members or other health professionals who have treated

2  him in the past.  And so that would be a, that would be

3  information you would have gained from, 1 and 2, the two thing

4  you say --

5          MR. DIAMONSTEIN:  Correct.

6          THE COURT:  -- that Ms. Weaver was able to do but they

7  didn't do?

8          MR. DIAMONSTEIN:  Correct.

9          THE COURT:  Okay.  And then you say "The evaluator

10 diagnosed him with borderline personality disorder, but also

11 concluded that they did not have enough information to confirm

12 his self-reported diagnosis of post-traumatic stress disorder."

13 And so those are your concerns?

14         MR. DIAMONSTEIN:  Correct.  And then additionally to

15 that, Judge, the presentence report that was prepared by

16 Ms. Weaver, she was able to contact the brother, Keymar Tucker,

17 to verify, and that's contained in the PSR Page 14 to verify

18 some of the family background and history of abuse.  And

19 additionally, she was able to determine that he was born a crack

20 baby, mentally retarded and fetal alcohol syndrome, and was also

21 sexually abused by his mother and father and was later sent to

22 family members who also abused him.  This is all information

23 that was not explored or looked into by the evaluators.

24         Additionally on Page 15, Paragraph 44, Ms. Weaver was

25 able to confirm that from the defendant's juvenile records that

1  the evaluators cannot request that the defendant was in fact

2  born 10 weeks premature, positive for cocaine and was mildly

3  mentally retarded.

4          THE COURT:  Okay.  So let's get Dr. Pietz on the

5  phone, then I'm going to let you all ask her questions.  Why not

6  just get to it?

7          MR. OPHARDT:  Your Honor, may I make one statement

8  quick?

9          THE COURT:  If we need to do it before getting her or

10  on the phone.

11          MR. OPHARDT:  I would like to mention on Page 4 of the

12  forensic report that Mr. Tucker did self-report the health

13  treatment at Hershey Medical Center as well as Maryview Medical

14  Center at age 7 and 12, respectively, and the reasons behind

15  that treatment.

16          In addition, in Paragraph 44 of the PSR it states that

17  Tucker had an evaluation which indicated mild retardation but

18  this diagnosis was later recanted.

19          THE COURT:  Okay.

20          MR. OPHARDT:  Which I think is important to know.

21          THE COURT:  Let's get her on the phone.  Then what

22  we'll do is, since she -- I'll give her a little bit of a

23  summary of what's gone on, and then Mr. Diamonstein, I'm going

24  to let you ask her some questions.  Mr. Ophardt you can follow

25  up.

```
 1              Madam Clerk.

 2              (Pause in the record as phone call was attempted and

 3  failed.)

 4              THE COURT:  All right.  Hang up.  I'm going to leave

 5  the bench.  Mr. Ophardt, you get it done.  Let me know, I'll

 6  come back.

 7              (Recess taken from 10:52 p.m. to 11:07 a.m.)

 8              THE COURT:  Mr. Ophardt?

 9              MR. OPHARDT:  Your Honor, I want to apologize on

10  behalf of the Department of Justice as a whole and collective

11  that she was unable to be reached.  I did arrange for her to be

12  available this morning by phone.  I believe that an arrangement

13  has been proffered to you of sending information to her.  I was

14  not comfortable sending the PSR beforehand, so I think if, Your

15  Honor, you could order that that be done along with the

16  additional report Mr. Diamonstein has referenced and set up a

17  definitive time that we can have her on the phone again?

18              THE COURT:  I'm not sure that we really need that if

19  we're going to do this.  Perhaps the way to do it is to, for the

20  court to issue an order sort of recounting that, you know, the

21  reference was made -- referral was made earlier, we now have a

22  presentence report.  Forwarding the presentence report to her

23  along with Mr. Diamonstein's motion where he recounts the

24  difference, the particular points that are in the presentence

25  report that she may not have had access to, and then your
```

1    response to that, and ask her in the order to specifically

2    consider the presentence report, consider the positions of the

3    two parties on this issue, and then advise the court, would that

4    in any way impact the conclusions that you have previously

5    offered.  And then we have, you know, we have another, an

6    amended addendum or an amendment to the report, however she

7    chooses to offer it.  And I may think about, you know, the order

8    that I issue, how I ask for it, but get that from her.  And then

9    if you all then, having that, decide that you want to ask some

10   questions, you can set it up again and we'll come back.  Because

11   if I just say go back to Missouri, then we've got the issues

12   that Mr. Diamonstein raised about some of the people that were

13   encountered by the defendant and things that he has described

14   occurring while he was there, we have that issue, and we have a

15   whole lot of additional time passing, and hopefully this will be

16   a little more expeditious.

17          MR. OPHARDT:  I understand, Your Honor.  That is, the

18   government is fine doing it on paper.  I think that would be the

19   most clear manner.

20          THE COURT:  Mr. Diamonstein, any objection to doing

21   that, Mr. Diamonstein?

22          MR. DIAMONSTEIN:  Obviously one additional thing that

23   there's a report that probation has from Comprehensive Mental

24   Health Associates dated February 20th, 2008 that I'd ask to be

25   forwarded also up.  I didn't know that they -- I don't believe

1   they had that information too.

2          THE COURT:  Okay.  We'll forward that also, Mr.

3   Diamonstein.

4          MR. DIAMONSTEIN:  And my client, if I can have a

5   moment to, just for him, with him, Your Honor, please?

6          THE COURT:  Okay.  And if he wants to address me about

7   anything, you know, I'll hear from him.

8          MR. DIAMONSTEIN:  I think that might be, if he can

9   come forward, I think he might be willing to do that.

10          (Counsel and defendant conferred.)

11          THE COURT:  Okay.  Let's administer the oath to Mr.

12   Tucker.

13          (Defendant was placed under oath.)

14          THE COURT:  Mr. Tucker, you understand that what we're

15   going to do is we're going to send the presentence report to the

16   psychologist that evaluated you in Missouri, Dr. Pietz, and

17   we're going to include with that this report, this additional

18   report that Mr. Diamonstein was just talking about, and I'm

19   going to ask her to tell me whether this additional information

20   would in any way affect the conclusions in her report that she

21   prepared to me, both the report on competency and the report on

22   sanity.  Do you understand that that's what I'm going to do?  Do

23   you understand that's what I'm going to do?

24          THE DEFENDANT:  A little bit.  I don't, I just don't,

25   I don't agree with it.

1        THE COURT:  You don't agree were it?  Okay.  Tell me

2   why you don't agree with it.

3        THE DEFENDANT:  Your Honor, to me I don't think she,

4   her decision gonna change.  Lot of stuff happened in Missouri,

5   and she, she, she, she got some, lot of stuff to do with what

6   happened to me, and I don't think, like, like...

7            (Counsel and defendant conferred.)

8        THE DEFENDANT:  Yeah, that's what I -- that too.

9        MR. DIAMONSTEIN:  He said that he didn't think she

10  could be objective in light of some of the treatment that he got

11  there.

12       THE COURT:  Well, let me hear from you.

13       THE DEFENDANT:  She, she, she said she ain't -- can I

14  just give you an example?

15       THE COURT:  Go ahead.

16       THE DEFENDANT:  Well, like I, when I told her I had

17  PTSD she tried to tell me that I wouldn't have PTSD because I

18  wasn't in the military.  She would stay stuff like -- I told her

19  about the rape and all that, and she used to say that I -- I

20  don't think she -- she say I'm exaggerating when I told her I

21  got raped, was her response to me when I told her what happened

22  to me.  And then the letters that I wrote to her and she

23  called --

24           (Counsel and defendant conferred.)

25       THE DEFENDANT:  BS.  The letters that I wrote about

1  everything about what happened to me, and she just says it's a

2  bunch of BS.  And I don't think she is right.  I don't, I

3  don't -- she ain't...

4           (Counsel and defendant conferred.)

5           THE DEFENDANT:  Yeah.  She can't be fair.  That's what

6  I want to say, honestly.

7           THE COURT:  Okay.  I --

8           THE DEFENDANT:  I told her about the people beating on

9  me, and she knew about it and she ain't do nothing.  And I told

10 her -- and after I got the cuts on my arm, she used to say that

11 I'm a drama queen because she said cutting yourself is a drama

12 queen.  And she don't come see me.  She ain't fair.  That's how

13 I feel.  She not right.  She just going to have the same

14 decision.

15          THE COURT:  All right.  I understand your position.

16 Is there anything else that you want to tell me he?

17          THE DEFENDANT:  I don't think so.

18          THE COURT:  Okay.  All right.  Well, very good.  Thank

19 you, Mr. Tucker.  You can have a seat back at the table.

20          Perhaps we should have a transcript of the proceedings

21 also prepared and forwarded with the request.

22          MR. OPHARDT:  No objection from the government.

23          THE COURT:  Is that something you wanted to address,

24 Mr. Ophardt?

25          MR. OPHARDT:  The transcript, Your Honor?

```
 1              THE COURT:  Hmm-hmm.

 2              MR. OPHARDT:  There's no objection from the government

 3   if the court feels that that would be beneficial.

 4              THE COURT:  Was there anything else you wanted to

 5   address?

 6              MR. OPHARDT:  Your Honor, I'm not going to respond to

 7   the allegations of what went on at Springfield.  I don't know

 8   enough about them.  I do feel that the report certainly appears

 9   that she is capable of impartiality.

10              I also would remind the court that in a psychological

11   interview setting, there's a certain amount of confrontation

12   that occurs to try to test the truth and veracity of an

13   individual's statements.  That's part of the technique to make

14   sure that the individual isn't lying.  So I would like to just

15   point that out as a counter-balance to the allegations.

16              MR. DIAMONSTEIN:  Judge, he, he -- my client obviously

17   is -- I just want to reiterate his points about, that Dr. Pietz,

18   his position is I don't believe he believes that she can be

19   impartial in light of some of the circumstances.

20              THE COURT:  I understood his point.

21              MR. DIAMONSTEIN:  I just want to reiterate that he

22   didn't understand why, the necessity of having a transcript done

23   for Dr. Pietz as well.

24              THE COURT:  Well, he doesn't have to understand

25   everything I do.  I'm doing it.  I'm sending it and we're going
```

```
 1   to get a report back.

 2              All right.  Anything else, Counsel?

 3              MR. DIAMONSTEIN:  Nothing further.

 4              MR. OPHARDT:  No, Your Honor.

 5              THE COURT:  Thank you.

 6              (Whereupon, proceedings concluded at 11:16 p.m.)

 7                              -  -  -

 8                           CERTIFICATION

 9

10          I certify that the foregoing is a true, complete and

11   correct transcript of the proceedings held in the above-entitled

12   matter.

13

14              _____

15                   Paul L. McManus, RMR, FCRR

16                        _____

17                             Date

18

19

20

21

22

23

24

25
```

Paul L. McManus, RMR, FCRR Official Court Reporter