IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. ) Criminal Action No.:
) 4:12cr28
MICHAEL JAY TUCKER, )
)
Defendant. )

TRANSCRIPT OF PROCEEDINGS

(Hearing on Motions)

Newport News, Virginia
July 9, 2013

BEFORE: THE HONORABLE MARK S. DAVIS
United States District Judge

Appearances:

OFFICE OF THE UNITED STATES ATTORNEY
By: JONATHAN A. OPHARDT, ESQUIRE
Counsel for the United States

PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
By: KEVIN M. DIAMONSTEIN, ESQUIRE
Counsel for Defendant

The Defendant appearing in person.

ALSO PRESENT: 3rd-years Laura Maughan and Kendall Hamilton

I N D E X

| | Page |
|---|---|
| **CHRISTINE PIETZ** | |
| Examination by the Court.................. | 28 |
| Examination by Mr. Diamonstein........... | 32 |
| Examination by Mr. Ophardt............... | 41 |
| Examination by Mr. Diamonstein........... | 44 |
| Examination by Mr. Ophardt............... | 46 |
| Examination by Mr. Diamonstein........... | 48 |
| Examination by the Court.................. | 49 |
| Examination by Mr. Diamonstein........... | 52 |

P R O C E E D I N G S

(Proceedings commenced at 11:04 a.m. as follows:)

COURTROOM DEPUTY: In Case No. 4:12cr28, United States of America v. Michael Jay Tucker. Mr. Ophardt, is the government ready?

MR. OPHARDT: Yes, we are. Good morning, Your Honor.

With me at counsel's table are third-year interns Laura Maughan and Kendall Hamilton. They will be observing the proceedings this morning.

THE COURT: Good to have you all.

COURTROOM DEPUTY: Mr. Diamonstein, is the defendant ready to proceed?

MR. DIAMONSTEIN: We are ready. Good morning, Your Honor.

THE COURT: Good morning, Mr. Diamonstein.

Let's review, perhaps, where we are. That might be helpful for me to kind of provide an overview of where we are and then we'll talk about where we're going to go.

On March 14th of last year, 2012, Michael Tucker and two others were indicted in a six-count indictment charging them with various offenses involving robberies. These stemmed from three armed robberies, one at the Happy Shopper convenience store in Hampton, January 22nd, 2012; one at the One Stop Food

Mart, January 23rd, 2012, and then one at a Hardee's on January 23rd, 2012. And they were in Hampton, Newport News and Hampton, respectively. Mr. Tucker was arrested on April 27, 2012 and of course has been in custody since that time. Over a year now.

On May 14, 2012, Mr. Tucker filed notice of his intent to rely on the insanity defense and to present expert testimony concerning his mental condition. On May 16th, Mr. Tucker filed a motion for psychiatric exam to determine his competency. The court issued an order granting that motion on May 17th of last year, and on May 29th the court ordered that Mr. Tucker be committed to the custody of the Attorney General so that he could be placed in a suitable facility for the purposes of conducting an examination to determine whether he was insane at the time of the violations charged in the indictment and whether was presently, he may presently be suffering from a mental disease or defect rendering him mentally incompetent. Defense counsel moved to continue the trial thereafter, and the trial was continued until further order in June of 2012.

The court received the ordered mental health evaluation on August 22nd, 2012. The report concluded that Mr. Tucker met the criteria for a diagnosis of borderline personality disorder, and based on his self-reported history, that he may also meet the criteria for a diagnosis of post-traumatic stress disorder, although the evaluators were

enable to confirm or disconfirm the report at that time. The report later found that Mr. Tucker has an adequate and rational understanding of the charges against him and the legal process as it relates to his specific situation, and noted that Mr. Tucker seemed willing to work with his current attorney.

The report ultimately concluded that Mr. Tucker is competent to proceed and will remain competent in the foreseeable future.

An attached forensic addendum concluded that although Mr. Tucker meets the criteria for borderline personality disorder and post-traumatic stress disorder, he does not meet the criteria for severe mental disease or defect according to the Insanity Defense Reform Act of 1984. The addendum also found Mr. Tucker clearly understood the nature and quality as well as the wrongfulness of his acts at the time of the alleged offenses, and noted that a final opinion regarding the criminal responsibility would be a matter for the trier of fact.

On October 1st of 2012 the court held a competency finding hearing. After reviewing the forensic report at length here in the courtroom, the court determined that Mr. Tucker was competent and capable of proceeding to trial and assisting his attorney in this matter.

The court concluded, based upon the agreement of counsel, I think, also, that it was not appropriate for the court to opine on the insanity offense -- excuse me, insanity

issue, and that was an issue for the finder of fact at trial should that be an issue at that time.

On December 20, 2012 the court entered an order authorizing a magistrate judge to conduct guilty plea proceedings in the case. Then on January 3rd, 2013, three months after his competency hearing, Mr. Tucker requested and consented to a magistrate judge conducting these proceedings on the guilty plea, and on that same day he appeared before Judge Douglas Miller and pled guilty to two counts of indictment: Count 4, brandishing a firearm during a crime of violence, and Count 6, brandishing a firearm during a crime of violence.

Judge Miller, after asking numerous questions of Mr. Tucker and satisfying himself that Mr. Tucker was able to make a knowing, free and voluntary guilty plea, accepted the guilty plea and the matter was continued for sentencing.

After Mr. Tucker pled guilty to Counts four and six before Judge Miller, he sent two letters to the court, one undated but received on March 6, 2013, and a second dated March 17, 2013. These letters complained Mr. Tucker had been physically abused while incarcerated, including several alleged beatings occurring at the Bureau of Prisons facility in Missouri at which Mr. Tucker was evaluated for competency and sanity, and also alleging that he was being denied food. Mr. Tucker also complained his competency and sanity evaluation was not accurate and that his attorney had done insufficient work to address

Mr. Tucker's complaints about his treatment or about his evaluations.

The sentencing was set for April 26, 2013. The presentence report was prepared on March 21st, 2013. So in between, on April 8, 2013, Mr. Tucker filed a position on sentencing that indicated he had no objections to the presentence report, but then a week later, on April 15th, defense counsel filed a motion to reassess Mr. Tucker's sanity at the time of the offense. Mr. Tucker claimed that the evaluators failed to follow up with his biological or adoptive parents and failed to obtain records from two medical centers. Mr. Tucker contended that had the evaluators followed up on his self-reported history, they would have been able to reach a more informed and educated conclusion regarding his sanity at the time of the offense. Mr. Tucker noted that, in preparing the presentence report, the probation officer was able to contact Mr. Tucker's brother and verify Mr. Tucker's family background and history of abuse which information Mr. Tucker argued could have impacted the evaluators' conclusions if they had endeavored to obtain it. Mr. Tucker asked the court to order that he be reassessed for sanity at the time of the alleged conduct.
Mr. Tucker did not challenge the court's competency finding, only the forensic report's conclusions, which the court did not adopt, concerning his sanity at the time of the offense. The addendum to the presentence report was prepared on April 17th.

On April 18th of this year, the government filed a response in opposition to Mr. Tucker's motion arguing that he should be allowed to withdraw his guilty plea and pursue an insanity defense, to the extent that he was asking to do so, because the forensic report and addendum clearly state that Mr. Tucker understood the nature and the wrongfulness of his actions, and therefore that even if he was suffering from a mental disease or defect, he would not qualify for the insanity defense.

By order of the court, Mr. Tucker's sentencing hearing was continued pending the resolution of his motion for reassessment of sanity, and on April 26th the hearing was reset as a motion hearing and conducted.

At that hearing, here in this courtroom, Mr. Tucker's motion to reevaluate his sanity was considered. Defense counsel at the time conceded that the evaluators at the Bureau of Prisons had credited Mr. Tucker's self-reported condition and history in forming their conclusions, but argued that out of an abundance of caution, Mr. Tucker should be reevaluated in light of the fact that he faced a mandatory minimum sentence that was quite significant, and the information contained in the presentence report which was in the original evaluator's report only by self-reporting and not by reference to the individuals that the probation officer had reached out to, and that Mr. Tucker's statements about the treatment he received in the

evaluating facility should also be considered. Defense counsel maintained that the second look was needed to determine whether the initial report could be relied upon.

As it did in its position paper, the government opposed Mr. Tucker's motion for reevaluation, arguing that the original evaluators had sufficiently evaluated and credited Mr. Tucker's self-reported history and noted that his motion seems only to attack the first prong of the sanity test; that is, whether Mr. Tucker suffers from a severe mental disease or defect. The government noted that there was plenty of evidence that, despite the presence of any mental disease or defect, Mr. Tucker was able to appreciate the nature, quality and wrongfulness of his actions, specifically, Mr. Tucker's admissions to his brother between the robberies and his flight to Ohio to avoid arrest. The government also argued Mr. Tucker did not challenge the determination regarding his competency to proceed, and that nothing in the presentence report undermined that determination.

In response, defense counsel noted that he was challenging all of the forensic report's conclusions. And in the view of the government, the fact that -- or defense counsel, the fact that evaluators did not have the proper background information prevented them from verifying and supporting their conclusions.

The court reviewed all of this new information that

defense counsel alleged had not adequately been considered by Mr. Tucker's evaluators, specifically the evaluators failed to contact Mr. Tucker's parents was one issue, and that they did not obtain records from two medical centers, and that they did not confirm Mr. Tucker's self-reported diagnoses. Defense counsel maintained that the presentence report showed that this information was available had the evaluators attempted to procure it, because of the fact that the probation officer had contacted Mr. Tucker's brother who verified Mr. Tucker's statements regarding his family, the fact that he was born as essentially what was known colloquially as a crack baby, and that they he had been described as mentally retarded and suffered from fetal alcohol syndrome, and that there were the issues of abuse by his mother and father and that he suffered further abuse at the hands of relatives.

Additionally, Paragraph 44 of the presentence report referenced juvenile records that confirmed many of these facts.

At the hearing on April 26, the court and counsel attempted to contact the initial evaluator by phone but were unsuccessful. The court determined that the best way to proceed was to issue an order forwarding the new information to the initial evaluator asking her to opine as to whether any of that information would have affected her conclusions. The government and defense counsel were amenable to proceeding in this fashion; however, defense counsel asked that a report from Comprehensive

Mental Health Associates be included in the information sent to the evaluator. The court then heard from Mr. Tucker who expressed concerns as to the evaluator's ability to be fair, and defense counsel echoed the concerns. The court at that time noted the concerns, but determined that it would proceed as referenced by referring the matter back to the initial evaluator.

On May 2nd, 2012 the court issued the order instructing the evaluator, Christina Pietz, P-i-e-t-z, Ph.D, to consider all of the information forward by the court and to advise the court in writing whether and to what extent any such information impacted her previous conclusions as to both Mr. Tucker's sanity at the time of the offenses and his competency to proceed and assist his attorney in this matter.

The court forwarded a copy of its May 2nd, 2012 order to the evaluator by letter of May 6th, and pursuant to that order, the letter included the following attachments: Mr. Tucker's motion for reassessment, the government's response in opposition to Mr. Tucker's motion, the presentence report and the addendum prepared for sentencing, a copy of Mr. Tucker's February 20, 2008 neuropsychological evaluation from Comprehensive Mental Health Associates, and a copy of the transcript from the court's April 26, 2013 hearing on Mr. Tucker's motion so that the evaluator could have the benefit of Mr. Tucker's comments, among other things, at that hearing.

On June 20, 2013 the court received the requested forensic addendum dated May 29, 2013. I call that the second addendum for my purposes. Following a review of the above procedural history and this new information, the second addendum states that the evaluator's "Opinion remains that Mr. Tucker meets the diagnostic criteria for borderline personality disorder." The second addendum goes on to explain the symptoms of this disorder in relation to Mr. Tucker's background as confirmed by the new information provided.

Additionally, the evaluator states that it "remains her opinion that Mr. Tucker does not meet the criteria for psychotic disorder", noting that "nothing in the new information suggests Mr. Tucker ever presented as psychotic."

She goes on, "Regarding the diagnosis of post-traumatic stress disorder, although Mr. Tucker experiences irritability or outbursts of danger [sic] he did not previously endorse nor does he otherwise meet any of the criteria required to support a diagnosis of post-traumatic stress disorder." Accordingly, the second addendum concludes, "Thus, in my opinion, Mr. Tucker does not currently meet the criteria for PTSD."

The PTSD [sic] then reviews the impact of the new information on the evaluator's original opinion. The court does note that although its original order requested a review of the evaluator's conclusions as to both Mr. Tucker's sanity at the

time of the instant offenses and his competency to proceed, the second addendum addresses only the question of Mr. Tucker's sanity. The second addendum does, however, incorporate the court's October 1st, 2012 competency ruling, noting that "Mr. Tucker was deemed competent to proceed in the foreseeable future," suggesting that the evaluator remains of the same opinion.

The second addendum, with respect to Mr. Tucker's sanity at the time of the offenses, notes that the July 2012 forensic report and addendum diagnosed Mr. Tucker with post-traumatic stress disorder by history, and borderline personality disorder. Although the second addendum finds that Mr. Tucker does not meet the criteria for a diagnosis of PTSD it concludes that "Nevertheless, a diagnosis of PTSD or borderline personality disorder does not meet the criteria for a mental disease or defect according to the Insanity Defense Reform Act of 1984."

Regarding the second element of the insanity defense; that is, that Mr. Tucker was unable to understand or whether he was able to understand the nature and quality or wrongfulness of his acts, the second addendum concludes that the same reasons indicated in the original report and addendum "As noted, based on Mr. Tucker's description of his charges and his reasoning behind his actions, it was my opinion and remains my opinion that he was able to appreciate the nature and quality as well as

the wrongfulness of his acts."

Less than a week after the court received the second addendum, Mr. Tucker sent a third letter dated June 24, 2013, it was docketed on June 26th, complaining that his attorney "is not doing his job," "is very ineffective" and "hasn't done anything to help Mr. Tucker on his case."Mr. Tucker claims that his life has been put in danger and that his attorney has violated some rules and conduct relating to the Bar Association and said that he'd like a new attorney. After receiving that, I docketed -- ordered that the letter be docketed as a motion for new counsel. On July 2nd, Mr. Tucker's attorney filed a motion to withdraw as attorney, citing Mr. Tucker's current position as evidence that Mr. Tucker didn't wish to proceed with him.

Based upon having received all of this information, the court set this hearing so as to be able to address the letter from the defendant, Mr. Diamonstein's motion, and then determining and considering whether to, how to address Mr. Tucker's sanity at the time -- the question of his sanity at the time of the offense.

I believe Mr. Ophardt, is it 11:45 that Dr. Pietz is sort of on standby for us?

MR. OPHARDT: That is correct, Your Honor.

THE COURT: Is it Pietz or Pietz?

MR. OPHARDT: I believe it's Pietz.

THE COURT: Oh.

MR. OPHARDT: But -- Pietz?

THE COURT: Pietz. Okay.

MR. OPHARDT: I haven't spoken to her on the phone. We've only exchanged emails.

THE COURT: So she's expecting us to call her at 11:45?

MR. OPHARDT: Yes, Your Honor.

THE COURT: All right. Mr. Diamonstein, what I'd like to do is ask Mr. Tucker to provide me any additional comments he'd like to provide regarding his letter and his request for new counsel after we administer the oath. Is there any reason we shouldn't proceed in that fashion?

MR. DIAMONSTEIN: No, sir.

THE COURT: All right. Let's administer the oath to Mr. Tucker and then he can address the court.

(Defendant was placed under oath.)

THE COURT: Good morning, Mr. Tucker.

THE DEFENDANT: Good morning, sir.

THE COURT: Mr. Tucker, I have your letter that you sent last month, and I wanted to give you the opportunity, if there was anything else you wanted to tell me, to do that. So is there anything else that you would like to tell me about your letter and your request for a new attorney?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

THE DEFENDANT: I wanted to -- I haven't got the letter.

THE COURT: What are you looking for, Mr. Tucker?

THE DEFENDANT: The copy.

THE COURT: Of the letter?

THE DEFENDANT: Yeah. I got it right there. I wanted to go into --

THE COURT: Mr. Diamonstein, do you want to get that letter for him, if he has it, the letter that he sent to the court most recently?

MR. DIAMONSTEIN: Sure.

THE DEFENDANT: I just...

THE COURT: That's fine if you want to reference that.

THE DEFENDANT: I wanted to go into detail about why I said my life was in danger and about the, how him not helping my case.

When I was in Missouri last year for my evaluation when I was getting assaulted by the COs I was writing Mr. Diamonstein and telling him what was going on. And I'm not sure if there's anything he could have did, but I'm pretty sure he could have, could have did something to get me out of the prison. And I was writing him a lot of times and I didn't get no response, and it kept going on. And then when I got back to Virginia I spoke to him, and his response, when I told him what was going on, when I told him what happened, he, his response

was... I don't remember exactly what he said. It was something like you need to focus on this and just leave that alone.

And I told him last, last year when I first got back from Missouri that my, the evaluation was not, was not correct. And it took him nine months to file paperwork for me to get reassessed when he should have did it last year when I first told him about it.

And he already told me that he, his words, his quote, he thinks I'm incompetent. I don't think I'm incompetent, but he said he think I'm incompetent. And he don't write me back at all. I wrote him more letters than this, there's like six letters, and the order that you sent last time I was here in the court, it took him about three weeks to send me a copy. And I've been writing him. My, I -- family has been calling him and he don't, it goes straight to voicemail. And it's getting very frustrating, because I -- and then I told him some information about myself case that he should have shared with the U.S. Attorney, but he keeps talking about other stuff, but it was vital information that he should know that -- I mean that I told him about that he, that the U.S. Attorney should know, and he didn't share it with 'em and still hasn't shared it with 'em, and I had to write a letter that's supposed to come tomorrow. But it's, it's getting frustrating because I don't think he's doing -- he's not doing his job, and --

THE COURT: You said you wrote a letter that is

supposed to come tomorrow?

THE DEFENDANT: I wrote a letter to the court clerk of this, of the court, about what I told him that he was supposed to share with the U.S. Attorney, because I didn't know about, I didn't know I was coming to court today until yesterday. I just found out until yesterday.

THE COURT: Well, why don't you tell us now what you wrote in that letter? It was a letter you wrote to the court, right?

THE DEFENDANT: Well, actually it says to Judge Davis.

THE COURT: Okay. To me?

THE DEFENDANT: But it's addressed to --

THE COURT: So tell me what was in that letter. Just a summary.

THE DEFENDANT: About my case and what really happened, that...

THE COURT: Take your time. Take a deep breath. Take your time. Go ahead.

THE DEFENDANT: Mr. Diamonstein says that I acted, I did my crime out of duress. I looked it up in the dictionary, and duress is coerce, coercion. And I got the legal definition over there. But I told him what happened, and my brother put it all on me, but he gave me the gun and sent me out there to go rob them stores. He knew who was going on, what Lindsay did, and then Terry asked him to do with it and they put it on me,

and my brother said I stole his gun, but I didn't steal his gun, he gave me his gun. And I feel in some type of way that he sat there and tried to lie on me when he -- they took advantage of me. And I told Mr. Diamonstein this last year and I told the evaluators that, I told her, and she -- I don't even understand, because it's like, this is the way I see it: They sat there -- and I said this in the letter to him, I mean in the letter -- that if I been taken advantage of so many times, and it's by my family that does this, like the rape and all the other stuff, my family keep doing this, then my brother try to kill me, just not two, not a couple weeks before I did my crime, and I called 911, I didn't make a report because I was scared, but I did, I said it -- I asked him what could happen to my brother if he pulled a gun out on me and put it to my face, but I was scared to tell him that he actually did it, like... But I called 911, and that night of the crime I told him I didn't want to do it and he gave me that gun and sent me out there. And I told him this and he didn't do nothing. And I, I think it's very important information because -- and they still out there, and he be sexually harassing my girl and he, he can sit there and come down there any day and hurt her. He already been harassing her. And they, they, they think he's -- he's in the Marine Reserve, but they think he's, they -- he making out to look like he's violent and he's very aggressive and he's not what he made out to seem to be. And I don't, I don't think it's right that I'm

sitting -- I feel like I'm being treated very unjustly because I'm, I had to sign a plea for 32 years, and I didn't, I didn't want to do it, and I told him I didn't want to do it, and they still out there, and the dude that set it up is still out there. And I just did what I thought -- I did what I thought was right and I told him that, and I guess I still -- I don't know. I guess I still did wrong, I guess. That's what he's saying. He said I acted under duress. But duress means coercion, and coercion means forced by threats, and it could be psychological or anything else. But I thought they was going to kill me, my brother had tried to kill me, so, and then the dude that set it up, and he sexually harassed me in the group home that I was just in in 2011, so I wanted to stop them from doing anything else to me.

So then I told him about my co-defendant when he -- the day I first came to court for federal, my co-defendant tried to assault me on the way to the federal courthouse. We got into a argument at the U.S. Marshal place, but I told him about it, then the man tried to sit there and beat me up in the car. And it's like he told, he told me that they already know that my co-defendant was the main, the main person. And then he told me --

THE COURT: You're pointing to Mr. Diamonstein --

THE DEFENDANT: Yeah, Mr. Diamonstein.

THE COURT: -- when you're saying "he"?

THE DEFENDANT: Yes. I'm sorry. Excuse me. Mr. Diamonstein. And Mr. Diamonstein told me that the only reason that the government is working with you is because they're taking into consideration that my mental, my mental, my mental health problems, but I don't feel that's right. And then they say that I, that I knew the, that I appreciated the nature of my crime and that I flew to Ohio. I didn't go -- I had, I had no choice but to go to Ohio because my probation got transferred and I was scheduled to leave that day anyway. So I didn't run from prosecution or nothing.

And, and I just feel like I'm being treated very unfairly. For them to sit there and say -- for Mr. Diamonstein saying they taking into effect my, my mental health problems, I don't think so. Because I've got -- they made me -- I had to sign a plea for 32 years, and I really, I didn't, I -- it's confusing, and I don't understand it, and...

THE COURT: So you think you're being treated unfairly because your brother is still free?

THE DEFENDANT: No. No. No. I was coerced. Excuse me. I was coerced to do my crime. They made me go out there and rob those stores. The man pulled the gun out on me. If you look at the videotape, I sat the gun on the counter, the man came in there each time and I gave him -- I didn't benefit from nothing. I didn't benefit from it. I told my brother what was going on. His response was, well, you already did the first

one, you might as well do the second one. He gave me his gun and told me how to hit the safe, but I didn't, I didn't hit -- hit means to get the safe. But I didn't get the safe. And he texted me during the crime. He knew what was going on. He didn't try to stop me or nothing. And I feel like it's not right because I didn't want to do it, I told him I didn't want to do it, but he sat there and, knowing that I'm, I'm, that... I can be easily pressured or something like that. That's what he did. And I really thought they was going to hurt her and -- my girl, and they still, and they still out there and he's still being harassing her. I spoke to her, he's been doing things and it's not right. And I feel like I'm being treated very unjustly, and he knew about this the whole time and didn't say nothing to nobody.

And I --

THE COURT: Okay. Anything else that you wanted to tell me?

THE DEFENDANT: One more thing. You sent me a copy of a letter that I wrote to you a couple months ago? This letter right here?

THE COURT: Let's see. What's the date of that? What was the date of my letter?

THE DEFENDANT: I don't have the date, but I know you wrote me back.

THE COURT: I wrote you on March 8, 2013.

THE DEFENDANT: And I, I just wanted to say that I would have thought the court would have known back then that I wasn't satisfied with my attorney, because I was, when I was in Norfolk I was real sick, I got down to 114 pounds. The U.S. Marshals didn't do their job. They, it took them three or four months to move me. And I told my lawyer that I was going to kill myself in front of him in the courtroom, and he didn't, he still, nobody said nothing. Then, then -- it's a lot. Then you said you sent the letter to the, to the, to the superintendent of the jail about the, what was going on in the jail, and they didn't do nothing. It took me about a month to see a psychiatrist, psychologist, and nobody still ain't do nothing. And I just... That's it, sir.

THE COURT: Okay. Well, thank you, Mr. Tucker.

Why don't you have a seat back at the table there.

Mr. Diamonstein, I have, of course, your pleadings and your statements about the 19 times, I think it is, that --

MR. DIAMONSTEIN: I want to make a correction, Judge. It was actually, on the June 14th date I went to visit Mr. Tucker and he had actually been transferred the week before. So I wanted to correct that to 18.

THE COURT: So it was 18 times?

MR. DIAMONSTEIN: 18, that's correct.

THE COURT: Because you went once and he wasn't there?

MR. DIAMONSTEIN: He had been transferred to Missouri

at that point some time.

THE COURT: Now he refers to these letters that he wrote after the last hearing. I think he says he's written you some letters. Have you been in contact with him during?

MR. DIAMONSTEIN: I responded to a letter. The letters were asking what the status of the case was. And at that time I didn't have a court date because the court had given the evaluators 60 days from the date of entry of the order. And ultimately I sent him a letter advising him that, with the court order, advising him that the court had given the evaluator 60 days and it would be after, July 2nd was the cutoff date to be exact, before we would determine when the next court date would be. And then I got the letters, at least the last two letters requesting new counsel, then I filed the motion and mailed him a copy of it.

THE COURT: What I'm probably going to do is, at 11:45, break from this consideration of this motion --

MR. DIAMONSTEIN: Sure.

THE COURT: -- and then we'll take it up again. But let me ask you this: Mr. Tucker has made this public and brought this issue out and summarized what he says he wrote in the letter that I should be receiving --

MR. DIAMONSTEIN: Right.

THE COURT: -- about the brother and his suggestions today that the brother knew about these crimes and was urging

him to commit them. Of course the defendant pled guilty before Magistrate Judge Miller, and lots of questions were asked, and ostensibly that was after consulting with you with all the facts of this case?

MR. DIAMONSTEIN: Judge, there was a discussion regarding duress at the beginning before we ever got to the point where a plea was entered. And based on the facts that I had and information I had, I didn't believe that defense was available to him.

THE COURT: So that was something you gave consideration to?

MR. DIAMONSTEIN: We certainly did. And I think as time went on, especially after the plea was entered -- I mean, it's a significant plea, 32 years, but the flip side of it was that the government had a third robbery charge that they didn't charge him, with an additional gun charge, and that they could have, which would have meant on additional 25 years on top of the 32. So that was the consideration in terms of entering the plea that the government was not going to initiate that third gun charge.

THE COURT: So without that plea he faced 57 --

MR. DIAMONSTEIN: That is correct.

THE COURT: -- years had he not pled guilty. So 57 versus the 32 that you got it down to at the plea?

MR. DIAMONSTEIN: And additionally there was a

cooperation agreement in the plea agreement, and we had met initially with some FBI over in Norfolk to go over a debriefing to assist him further and perhaps reducing that sentence down from where it was.

THE COURT: So you were setting up him up for what you hoped to be a motion for a sentence reduction --

MR. DIAMONSTEIN: Certainly.

THE COURT: -- after sentencing?

MR. DIAMONSTEIN: That is correct. And then once the presentence report came to light and this additional information came out about his mental health issues that were not available to the folks in Missouri, I felt it was necessary to bring that to the court's attention to reassess him out of an abundance of caution, because at this point in time the plea was obviously taken by the magistrate judge and the court has not entered a guilty finding at this point in time. And so that's where we are.

THE COURT: Although it's a significant hurdle once a magistrate judge has accepted --

MR. DIAMONSTEIN: Certainly it is.

THE COURT: -- the guilty plea, it's a quite significant hurdle for a defendant to withdraw. And you haven't asked to withdraw at this point, I don't think.

MR. DIAMONSTEIN: Well, we had, we had a discussion about that being the next step that he would want to proceed.

And where it makes it very -- for me to continue on as counsel for Mr. Tucker and then to file a motion to withdraw and obviously trying to theorize what I would say in the motion to withdraw when I was the one who had counseled him to enter the plea, I would have some -- I would be working against myself and it would be a difficult issue for me to resolve, when I had recommended the plea and then thereafter filing a separate motion to withdraw the plea when I was the same attorney who recommended accepting it initially. That's really where we're headed, the next step here.

THE COURT: Okay. Well, let's take it one step at a time and see where we go.

Madam Clerk, do you initiate this?

COURTROOM DEPUTY: Yes, sir.

THE COURT: Why don't we try it. It's 11:43 and I don't want to miss the window. That may have been what happened last time.

MR. DIAMONSTEIN: I do have some questions too.

THE COURT: Okay. I'll sort of set it up and then give you all the opportunity.

(Dr. Pietz joined the proceedings via teleconference.)

THE COURT: Dr. Pietz, this is Judge Davis calling.

THE WITNESS: Yes.

THE COURT: Good morning.

THE WITNESS: Good morning.

THE COURT: Thank you for taking our call.

We are calling you from the courtroom so that everybody can hear what we're saying right now. And before we proceed, I'd like to ask the clerk to place you under oath, okay?

THE WITNESS: Okay.

THE COURT: Madam Clerk, go ahead.

CHRISTINE PIETZ, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q. All right. Well, Dr. Pietz, I want to kind of tell you where we, what we are doing and then ask a few questions, then the attorneys may follow up with some questions.

You, of course, conducted the evaluation on Mr. Tucker. We had a hearing based upon -- after that, based upon some suggestions that were made to the court about additional information that should have been considered. And so after the court's hearing back in April I ordered that the transcript be prepared and that this additional information that we had be forwarded to you so that you could give further consideration to your conclusions. And after that was done, I received your second addendum which reiterated the original conclusion that Mr. Tucker was not suffering from a severe mental disease or defect at the time of the offenses such that he was unable to

appreciate the nature and quality or the wrongfulness of his actions. And so we received that. And in that, what I'll call that the second addendum, that most latest report that you prepared, I had asked that you review your conclusions both as to Mr. Tucker's sanity at the time of the offenses, the three convenience store robberies, and also his competency to proceed.

You, I think, expressly addressed the question of his sanity, and then in your second addendum you incorporated your previous competency finding stating that Mr. Tucker was deemed competent to proceed in the foreseeable future in the past.

Because I had really wanted you to look at both the sanity and the competence, I do, before I turn this over to the attorneys to ask them for any questions they may have, want to give you the opportunity to specifically comment on whether anything that we sent you and that you reviewed changed any of your previously stated opinions about Mr. Tucker's competency to proceed.?

A. Let me clarify something. I did not reassess his competency. Competency is a present-tense issue. And so without actually interviewing him -- I think my original report was done in June of 2009, and so I think that's correct. No. I think it was done earlier. Or later than that. Without actually interviewing him, given that competency is a present-tense issue, it would be difficult for me to say with any degree of certainty that today he's competent to stand trial

given that it is a present-tense issue.

And I don't recall in the second court order -- and I'm looking at -- actually I don't have the court order in front of me, but I do have a synopsis of that court order in the second paragraph of my identification and reason for referral. I don't see that you had asked me to reassess his competency. I thought I was asked to reassess his sanity at the time of the robberies.

Q. So if you had understood it to be asking for a reevaluation of his competency, are you saying that because that's a present-tense determination, you would have responded that, without having him there before you, you wouldn't be able to fully do that?

A. Correct. But let me add this caveat: There was nothing in the information that changed my opinion regarding his actual diagnosis. And in order for him to be deemed not competent to stand trial, according to the 4241 statute, he would have to suffer from a severe mental disease or defect which would cause him to be not competent. So there was nothing in the new material that changed my opinion regarding, suggesting that he did indeed suffer from a severe mental disease or defect.

Q. Okay.

A. But without actually asking him the similar questions that I asked him when I evaluated him before regarding competency related issues, I wouldn't feel comfortable giving an opinion on competency, because it is a present-tense issue. I know my

answer's somewhat convoluted.

Q. Well, as I understand your answer, because you found that he's not suffering from such a significant severe mental disease, you would not, even though competency is a current medical determination, current -- present-tense determination, you're saying that you wouldn't expect that to be revisited since you see nothing to suggest that your original diagnosis was incorrect?

A. Correct. I don't see anything that would expect me to change my original opinion that he's competent to stand trial based on the information I was provided.

Q. Okay. All right. Well, of course the -- I don't know the degree to which you have just come from doing something else or exactly what you're doing, but I will note these charges that we have here stemmed from three armed robberies in January of 2012, and the motion for the psychiatric exam to determine competency was filed in May of 2012, and then Mr. Tucker was transferred to the Bureau of Prisons for that sometime thereafter, and then I received the mental health evaluation that you had originally prepared on August 22nd, 2012, and that's when the suggestion was made to the court that the probation officer had, in preparing the presentence report, been able to speak to Mr. Tucker's family and confirmed some of the information that he had self-reported to you regarding the post-traumatic stress disorder, among other things, and there was some suggestion that

perhaps having had that corroborated, that the court should provide you with all that information and see if it changed any of your conclusions. And that was a large part of the reason that the court decided to, out of an abundance of caution, to send this back and give you all that information. So that's just sort of the summary of the court's thinking in sending this back to you.

What I want to do now is we have two attorneys here in the courtroom, along with Mr. Tucker. Everybody's hearing what I'm saying and what you're saying, and Mr. Ophardt is the attorney for the government and Mr. Diamonstein is the attorney for Mr. Tucker, and I'm going to give them an opportunity to ask you any questions, and if you need to take a moment and refer to your report, please take your time to do that, and we'll proceed in that fashion. Do you have any questions?

A. I don't.

THE COURT: All right. I'm going to have Mr. Diamonstein ask first and then Mr. Ophardt.

Mr. Diamonstein?

EXAMINATION

BY MR. DIAMONSTEIN:

Q. Good morning.

A. Good morning.

Q. We have -- Mr. Tucker has some questions that we would like to see if you can help us with.

A. You know, it would -- I'm having a hard time hearing you.
Q. Can you hear me now?
A. I can hear you better. Thank you.
Q. Okay. Did Mr. Tucker ever write you any letters in reference to him experiencing suicidal thoughts?
A. I believe that he -- I can't say with absolute certainty if he wrote me a letter, but he did talk to me one time on rounds about having suicidal thoughts. And he also, during the initial interview that I did soon after his arrival, told me that he had suicidal thoughts.
Q. Okay. So maybe two times that he, you had talked to him about this?
A. At least two times during his evaluation we talked about it.
Q. Okay. Did Mr. Tucker write to you any letters regarding his family, his past or about his current mindset?
A. He did write me a letter about his current mindset. I don't recall if there was actually information in there about his family.
Q. Do you know how many letters you got relative to that particular issue?
A. I can't say with absolute certainty.
Q. Okay.
A. Let me let you know: I don't have his file in front of me. I have the two reports, but I don't have his medical file or his

central file.

THE COURT: Why is that, Dr. Pietz?

THE WITNESS: Why don't I have that?

THE COURT: Yes.

THE WITNESS: Well, for a couple of reasons. I have not -- I wasn't privy to what it was I was testifying about. I was just told to be prepared to answer questions about the forensic addendum that I did. I wasn't aware that I was testifying as an expert witness today.

THE COURT: All right. Go ahead, Mr. Diamonstein.

MR. DIAMONSTEIN: Thank you.

BY MR. DIAMONSTEIN:

Q. Did Mr. Tucker ever speak to you or Dr. Watson about his past, and how often?

A. He did talk to me about his past. And if you look at my report dated July 27th, 2012 from Page 2 to Page 4, there's information that he provided to me about his past. And that was an interview that Dr. Watson and I did together with him. It was an interview to gather information about his personal history. So that would have been probably a couple of hours that we interviewed him to get that information from him.

Q. Okay. Did Mr. Tucker ever say anything in writing or when you interviewed him about hearing voices due to his traumatic past?

A. I don't recall him telling me that.

Q. Did you ever have a discussion with him about Mr. Tucker wearing a shirt over his face during the commission of these robberies? Any discussion about that?
A. I do recall him telling me that he did that.
Q. Did he tell you why? If you remember?
A. Without looking at my notes, I don't remember why exactly he said he did that.
Q. When you initially met with Mr. Tucker what was his demeanor?
A. This would have been on June 14th, 2012 --
Q. Yes.
A. -- is that what you're --
Q. Yes, yes, I am.
A. -- asking me?

He presented as fearful. He didn't want to move off the locked unit. He provided information, during the initial interview he provided the information that we needed from him to make some decisions about how to proceed with the evaluation and also what sort of information we needed in order to make some decisions about his housing status. He, as I noted in my report, he spoke very candidly about his concerns for his safety in the institution. He told me that he had been in fights when he was incarcerated before and was concerned -- and he actually said it was for self-defense, but he indicated that he had to do that, and he was concerned if I moved him to an open unit that

he might have to engage in similar behavior.

His -- he was very coherent. There wasn't any indication that he was suffering from any psychotic disorder, and I base that on his, his speech was organized, there was not a flight of ideas, he didn't move rapidly from subject to subject. He did, he did come across as slightly depressed, but certainly not such that I felt like he was at risk for engaging in self harm. Had he been so depressed that I was concerned he might harm himself, I would have put him on suicide status, and I did not do that. And for the most part I would say he was very cooperative. He answered the questions that we asked him, but again, presented as slightly depressed and fearful, which he attributed to being in the jail setting.

Q. Thank you. Did Mr. Tucker ever address to you hearing voices?

A. In my initial interview he did not. And actually I noted in my report that, if you look on Page 4, this is in my original report, he did talk about having an imaginary friend which sometimes talked to him. He also talked about a spirit that he named Joshua and described this person as a glowing, shadowy figure, which you could, that could be considered a visual hallucination in that the person spoke to him, and he could also see the person. So it would be an auditory and a visual hallucination.

Q. Okay. Approximately how many tests did you administer to

Mr. Tucker regarding his level of education, IQ, reading?

A. Well, you can't, there isn't a test that addresses level of education. But in terms of IQ, I did not administer any IQ test to go him.

Q. Okay. How many times did you actually meet with Mr. Tucker to interview him, if you know?

A. Again, I can't say without referring to my notes. We saw him weekly. I actually saw him more than weekly, because as noted in my June -- July, 2012 report, he was in restraints at one point and he was on suicide watch at one point, so consequently we had to see him every day that he was on suicide watch and in restraints. I conducted the, along with Dr. Watson, a competency interview with him. We did the, we gathered social history from him. So that would have been two separate interviews. And I'm talking about formal interviews that last at least an hour. Then we interviewed him a couple of times about his version of what happened at the time of the offense.

Q. Okay. And you said he was put in restraints. Was that as a result of him attempting to harm himself? Is that why that was done?

A. Yes.

Q. And did you see that or did he write a letter to that effect or how did that, how did you get information that caused you to have to put him in restraints?

A. I don't believe I was the person that actually put him in restraints, I think he was put in restraints by the on-call psychologist. But what happened was he cut himself. And again, if you look at my report, the staff that were involved, correctional staff, nursing staff and mental health staff, believed it was a superficial cut, but the documentation clearly stated that he presented as manic and manipulative. There was a belief that he did this for secondary gain. He cut his arm, we think, with a staple. It didn't, the actual cut was approximately two inches. And it didn't require any sort of suture, any -- other than cleaning it up, it didn't require anything other than that. So he was placed in restraints by -- I think it happened in the late evening, and the on-call psychologist decided that there was a concern that he might engage in further harm, so the on-call psychologist made the decision to put him in restraints.

Q. Okay. If an inmate who is being evaluated at your facility has a complaint about his treatment, what is the protocol that they would follow?

A. Well, are you talking about medical treatment? Mental health? What? Correctional?

Q. Correctional. Somebody in the correctional facility abuses the inmate, what would the, what is the protocol that the inmate would follow to file a grievance?

A. Well, there's actually, there's -- if you look at our

policy, the inmate needs to file what you call a BP8. Then if they don't feel like resolution has been granted, then they can file I believe it's a BP9. They just continue filing grievances. They can -- apparently -- I don't know, the case manager monitors all of this -- but they can file all the way up to the region until their issues are addressed.

In addition to that, our warden and associate warden make weekly rounds and they attempt to visit with every patient on the mental health unit. Given that he was locked, his only access to the warden and the associate warden would be when the warden is conducting rounds. That's an opportunity for him to tell the warden that he's being abused or he's concerned about the conditions of his confinement.

The lieutenant makes daily rounds, and he can tell the lieutenant that he -- if it's an officer on the unit he probably wouldn't want to report it to the officer on the unit, but the officer's supervisor is a lieutenant, and he would have the opportunity to tell the lieutenant if he had concerns about the conditions of his confinement.

Q. Would you receive information about an inmate grievance if it was brought up?

A. You know, it depends. There are times when I'm not made privy to that sort of information. There are other times when officers might share that information with me or the lieutenant might share that information with me. I can't recall, I've

worked at this institution for almost 23 years an I can't recall a warden or an associate warden ever sharing with me that there's been a grievance made by an inmate, or during rounds that something was mentioned to them.

Now, my boss, the chief of psychology, when he conducts rounds -- and that's another opportunity for patients to express concerns -- he has shared with me things that patients, my patients have said about something that's going on. But if there was a grievance against correctional staff, I'm not, I'm not certain that I would be made aware of that.

Q. Would the, do inmates, would they disclose that information to you, that they have done that? Is that something that --

A. I have had inmates tell me that, yes. I have had inmates tell me that they are filing a grievance against a correctional officer.

I've also had -- and again, I call them patients. I've had patients tell me about things that have happened to them that, things that correctional staff have done to them while they're at this facility.

Q. And do you have any duty to report that information to follow up on it?

A. I do have a duty to report that.

Q. And did Mr. Tucker ever tell you about any issues he had about his treatment that needed to be addressed as a grievance or not?

A. He did tell me that.

Q. And what was your followup to that?

A. Well, when the officer that he reported had mistreated him, I confronted that officer and I told my boss about it.

Q. And any repercussions as a result of his grievance about the particular officer that he filed against?

A. I wouldn't be made aware of that. If there was some sort of repercussion, it's not something that administrative staff would share with me.

Q. Is that officer still employed at the facility?

A. I don't know.

Q. Don't know. Okay.

A. I can't tell you with certainty who was working the unit when Mr. Tucker made these allegations.

Q. But he told you of them and you followed up on it?

A. Yes.

MR. DIAMONSTEIN: All right. I don't have any other questions. Thank you.

THE COURT: All right. Mr. Diamonstein, you can consult with Mr. Tucker, and Dr. Pietz, we're going to let Mr. Ophardt ask you a few questions now.

EXAMINATION

BY MR. OPHARDT:

Q. Good afternoon, Doctor.

A. Good afternoon.

Q. Just a few questions.

You were asked regarding Mr. Tucker's hearing of voices and you described his self-reporting regarding that, and a spirit named Joshua. Was there any independent observation of Mr. Tucker responding to internal stimuli while he was at the facility?

A. No.

THE COURT: And I'm going interject and ask, can you, in layman's terms, tell us what that means?

THE WITNESS: Well, what that means is that Mr. Tucker was never observed listening to voices. He was, throughout his evaluation was locked in a room by himself. He was on our locked unit. And staff never -- this would be correctional staff, nursing staff, mental health staff, never observed him talking to voices or listening, presenting as if he was listening to voices in his room. The internal stimuli would be an auditory hallucination. Or there was never any indication that he saw things in his room, which would be a visual hallucination that did not exist.

THE COURT: Thank you.

BY MR. OPHARDT:

Q. Doctor, was Mr. Tucker administered the Minnesota Multiphasic Personality Inventory-II?

A. Yes.

Q. And in his responses, was there any indication of

overreporting?

A. Yes.

Q. And what would that mean, "overreporting"?

A. Well, what that would suggest, if you look at, on Page 9, I think it's on Page 9 of my original report, the 2012 report, I talk about my interpretation of that. And there are two things that it could mean: One is that he, he endorsed a number of items that a person that has a *bona fide* mental illness would not have endorsed. It's possible that he did that because he wanted to bring attention to himself; that he did it for a cry of help; or that he did it as a, he did it for the reason to exaggerate the nature of his difficulties.

If you notice, I said that the finding should be interpreted with caution. I didn't assign a diagnosis of malingering, but my interpretation of his test suggested that he was clearly endorsing a number of unusual responses infrequent symptoms, and what I mean by that are symptoms that aren't typically seen in someone that has a genuine mental illness. So consequently I made the comment that the result of the testing should be cautiously interpreted.

MR. OPHARDT: Thank you, Doctor.

Your Honor, I have no further questions.

MR. DIAMONSTEIN: I may have some follow-up.

THE COURT: All right. Dr. Pietz, give us just a moment. I think after Mr. Diamonstein consults with Mr. Tucker

he's going to have a few more questions.

(Defendant conferred with counsel.)

EXAMINATION

BY MR. DIAMONSTEIN:

Q. Dr. Pietz, Mr. Tucker -- you only recall receiving one of his correspondences about his past; is that correct?

A. You know, I don't know how many letters. If you look at my report I used plural; that I received letters from him. I don't know how many I received from him.

Q. What medications was he on when he was at your facility?

A. He was taking a -- I'm going to spell it for you. A-c-e-t-a-m-i-n-o-p-h-e-n.

Q. Could you say that?

A. It was for pain. He was not on any sort of -- I'm sorry, he was, and he was also on, he arrived at our facility on Geodon, G-e-o-d-o-n. He was taken 20 milligrams in the morning and 40 milligrams in the evening. And he was also on Cogentin, which is C-o-g-e-n [sic]. He was on two milligrams of Cogentin, and that actually was, that's a medication that's given for side effects of, from the Geodon. And he actually asked, on July 25th, 2012 he asked that those medications be discontinued. So we discontinued those medications on July 25th.

He then was given 75 milligrams of Effexor, three tablets at bed time. And this was also prescribed when he arrived at this facility, and he continued taking that medication.

Q. Is that for sleeping, Effexor?

A. Well, the Effexor is actually a mood stablizer given -- and if you look at -- I don't know if you've looked through his records, but he has a lot of behavioral problems, and the Effexor calms him down, helps him with more manageable behavior.

Q. And the court's referral to the second addendum on the last page, I had previously asked you about whether he discussed wearing a shirt over his face and you wrote in the report that Mr. Tucker indicated he wore a shirt over his face to conceal his identity during the commission of these crimes. Is that accurate?

A. That's accurate. Uh-huh.

Q. Okay. So you clarified the earlier statement that you didn't know why he put the shirt over his head?

A. Right. I don't have my notes in front of me. And if that's what I put in my original report, that's in my notes from my interview with him.

Q. Okay. And do you also know that these were not bank robberies, they were convenience store robberies? Are you aware of that?

A. Yes.

Q. Because in your letter, the fourth sentence from the bottom --

A. I see, where I said "at the time of the bank robberies."

Q. And it was actually convenience store robberies. Okay.

And you indicated that you can't determine competency right now because it's a present-tense evaluation; is that right?

A. What I said was there was nothing that I reviewed that would expect me to change my opinion, but given that that's a present-tense issue, I can't render an opinion on his competency today.

MR. DIAMONSTEIN: Okay. Thank you.

THE COURT: Mr. Ophardt?

EXAMINATION

BY MR. OPHARDT:

Q. Doctor, I have one question regarding the discontinuing of Geodon on April 25 per the defendant's request. Was Geodon ever medically necessary in your opinion?

A. You know, I, I, I have a different opinion from the psychiatrist that prescribes the medication. It's my opinion that Mr. Tucker suffers from a borderline personality disorder. And I also have a private practice outside of the prison facility, and my patients in my private practice seem to do well on an antipsychotic or a mood stabilizing medication. Many of the disruptive behaviors that you see in borderlines, once they're on a low dose of antipsychotic medication or mood stabilizing medication, they're just better able to function in society. The psychiatrist that prescribes, that prescribed Mr. Tucker's medication disagrees with me. He doesn't think that borderlines do respond favorably to medication.

So in my opinion I do think that the Geodon was helpful and I think the Effexor was helpful for him in that it helped control his behavior. When Mr. Tucker was at this facility he engaged in a lot of what I call acting-out behavior. And had he stayed on the Geodon he probably would not have engaged in that sort of behavior to the extent that he did.

Q. Well, Doctor, he was on Geodon from June, his arrival, until July 25th; is that correct?

A. Correct.

Q. And he was still acting out; is that correct?

A. Well, correct. I mean, that's why he ended up in restraints, is he was, he was acting out, he tried to, he made a superficial wound with a staple. And again, the message that I received about that behavior was it was -- it wasn't because he was a suicidal and it wasn't because he was depressed, it was because he was angry at staff and he was doing it for manipulative reasons.

Q. And you stated that the psychiatrist has a different view on Geodon and Mr. Tucker. Is that why the psychiatrist granted the request to discontinue it?

A. Yes. Yes.

MR. OPHARDT: Thank you.

No further questions.

THE COURT: Anything else that you have, Mr. Diamonstein?

EXAMINATION

BY MR. DIAMONSTEIN:

Q. Dr. Pietz, did you actually observe the cuts that he had on him?

A. Yes. I saw him the next morning.

Q. And did you determine that he had used a staple to cut himself?

A. Yes.

Q. Is that what he told you?

A. That's what -- when I came in to work the next morning, that's what the nursing staff shared with me.

Q. I see. And then they, he did not require any stitches, but there were pretty long scratch marks on his arm? They weren't just little short -- like I think of a staple I think of about, you know, one inch. Was it long scratch marks on his arm, if you recall?

A. About two inches.

Q. Two inches. Okay.

He didn't require any sutures or anything of that like?

A. He did not require sutures.

Q. Okay. That's when he was put on restraints after that?

A. Correct.

Q. Did you order the restraints or the night staff who did that?

A. It was the on-call psychologist. And again, I don't know

who was on call that night, but the on-call psychologist ordered the restraints.

MR. DIAMONSTEIN: All right. Thank you.

THE COURT: Dr. Pietz, it's Judge Davis again. I have two, I think only two questions. I hope only two.

EXAMINATION

BY THE COURT:

Q. First, the second addendum doesn't specifically, I think, refer to the new information that the court sent along when you concluded that a diagnosis of post-traumatic stress disorder is no longer warranted. It seems to me that it may be implicit, but I just wanted to give you the opportunity on the record to comment on whether anything in the new information changed your prior opinion about post-traumatic stress disorder and why you didn't think that applied.

A. Well, as I noted in the report, there are a number of criteria for, to render that particular diagnosis. The No. 1 criteria is that the person has to have endured some sort of traumatic event. And based on the information that, the new information that you provided, it was confirmed that Mr. Tucker likely endured physical and sexual abuse during his childhood. And there were probably some other issues. There was a comment made that they had to frequently move so that his mother couldn't find him, which could be traumatic for a child to have to go through that sort of a thing. But it also requires that

the traumatic event is persistently reexperienced. And as I noted in my report, I didn't think -- when we talked to him about those particular criteria, he did not endorse the criteria. There wasn't, for example, a startled exaggerated -- exaggerated startle response. He didn't -- when an individual has PTSD they often avoid talking about those particular issues, and Mr. Tucker didn't avoid talking about them. He actually -- in my opinion, he used that particular experience to justify some of the behavior that he engaged in.

He doesn't have irritability or outbursts of anger that you see in some individuals that have post-traumatic stress disorder.

So in my opinion, even though he has -- it's been confirmed he experienced a traumatic event during childhood, or what the DSM calls an extreme traumatic stressor, he doesn't meet the criteria for the other, he doesn't meet the criteria for the other necessary items in order for that diagnosis to be rendered.

Now, I will say that many individuals that have this sort of trauma in their lives eventually develop borderline personality characteristics. And I think that's likely the reason that he did have many of the criteria of borderline personality disorder.

Q. Okay. But even if he did have post-traumatic stress disorder, as I understand it, I think you commented that that

would not meet the criteria for severe mental defect?

A. Right. According to the Insanity Act Reform Act of 1984, and this is also in Title 18 Section 4242, in order for an individual to be considered insane at the time of the offense, they have to meet the criteria for severe mental disease or defect. A defect would be mental retardation or some sort of severe cognitive disorder. A mental illness, the mental illness that's most likely responsible for this would be some sort of psychotic condition. Post-traumatic stress disorder does not meet the criteria for a severe mental disease.

Q. Okay. And just since we are taking testimony from you, I think I should get on the record a little more about you. You, in your reports, are listed as forensic psychologist and Board-certified in forensic psychology. Can you just give us a quick summary of your educational background and your time there?

A. I have a Bachelor's degree from Creighton University which was awarded in 1982. I have a Master's degree in psychology from Sam Houston State University which was awarded in 1984. My Ph.D is from Texas A&M University which was awarded in 1989. I completed an internship and post-doctoral fellowship at the University of Texas Medical School. I'm Board-certified in forensic psychology. And I've worked at the United States Medical Center for Federal Prisoners for 23 years.

THE COURT: Okay. Thank you.

Counsel, do either of you have any additional questions before we conclude? Mr. Diamonstein?

(Defendant conferred with counsel.)

THE COURT: Dr. Pietz, while we have you I want to make sure we have asked everything, and that's why I want to make sure I go back a final time.

(Defendant conferred with counsel.)

EXAMINATION

BY MR. DIAMONSTEIN:

Q. Dr. Pietz, as to the PTSD, you indicated that -- did Mr. Tucker -- so you do not think he suffers from PTSD; is that correct?

A. That's correct.

Q. Even though he's had, according to information he's related to me, he's been sexually abused, raped in the jail, attempted murder by his brother, those aren't traumatic events that he's relived that would qualify him to be diagnosed as PTSD?

A. As I noted in my testimony, I do think that he has experienced traumatic events. Many individuals have experienced traumatic events, but that doesn't necessarily equate with a diagnosis of post-traumatic stress disorder. You have to actually meet the criteria. Not only do you have to have experienced those traumatic evented, but you have to meet the criteria for the diagnosis. And in my opinion, Mr. Tucker does not.

Q. Is there a number of experiences you have to have to get the level where you are PTSD?

A. I'm going to answer the way many psychologists do: It depends. There are some individuals that have one traumatic experience and suffer post-traumatic stress disorder. There are individuals that experience many traumatic events and never experience a post-traumatic stress disorder. So it depends on the person. It depends on the resiliency of the person. There are many factors that --

Q. The person's ability to cope with the stress will determine whether or not they will suffer PTSD or not?

A. You know, I don't -- I think that's part of it. I think some of it has to do with the resiliency of the person. Some of it has to do, for example, if we're talking about a child that's been sexually abused, it has to do with how their parents respond to the sexual abuse.

Q. You mean like getting them in counseling and help to overcome the experience that they had, things like that?

A. I think that can help. Again, it depends. And I don't, I don't -- I can't say with any certainty that if you do this or you don't do this you won't develop the disorder. I don't know that it's that tangible for us to understand. It's similar to why do some people that are diagnosed with cancer respond to chemotherapy and others don't. We don't have an answer to that.

MR. DIAMONSTEIN: Okay. All right. Thank you.

THE COURT: Doctor, it's Judge Davis again. I'll just recount for you that during some of your testimony, Mr. Tucker has been acting in a sort of dramatic way and putting his face in his hands and putting his hands up as if to seem surprised. You're not questioning the reports that Mr. Tucker has made or that others have made that he underwent these events in his life? You're not questioning those reports, are you?

THE WITNESS: No, I am not.

THE COURT: And even though you said that he does not have post-traumatic stress disorder, you used another term that is sort of a lesser condition. I can't remember what it was.

THE WITNESS: I said in my report he suffers from borderline personality disorder. And if you look at my July 2012 report I describe exactly what borderline personality disorder is.

And it's interesting that you use the word dramatic, because often individuals that suffer from a borderline personality disorder, they engage in a lot of drama. They have learned that when they present in a dramatic manner, they're more likely to be noticed. And I talk about, on Page 11 of my report, as a means of coping, they -- it's not like they don't have intense feelings. They do. But they often engage in suicidal threats, gestures, self-harming acts as a way to get attention. Or they engage in some sort of dramatic presentation as a way to get attention. And unfortunately in my opinion,

that's what Mr. Tucker has learned to do. That's his coping mechanism as he goes through life.

THE COURT: Okay. Mr. Ophardt, any questions?

MR. OPHARDT: No, Your Honor.

THE COURT: All right. Well, Dr. Pietz, thank you very much for your time. And we're going to let you go now and hang up the phone. Thank you.

THE WITNESS: Okay. Thank you, Your Honor.

THE COURT: Okay. Now, counsel, let's return now to this issue of Mr. Tucker's request for new counsel. Mr. Diamonstein, was there anything else that you wanted to address regarding that request by Mr. Tucker and your resulting motion?

MR. DIAMONSTEIN: Judge, the only, the primary emphasis was obviously Mr. Tucker to have representation that he's satisfied with. You look at the gravity of the offense that he's facing, he obviously, based on the correspondences he sent could the court and myself, does not think that I have done an effective job for him, and under the circumstances, in light of the fact at this point in time he's, although he's entered a guilty plea in front of the magistrate, he hasn't, the guilty plea has not been, at this point in time, been accepted by the court, and there is discussion that he wants to withdraw the guilty plea, and if I was to stay in the case, it would put me in a very awkward position given the fact that I recommended to accept the plea and then thereafter I would then have to file

the supplemental motion to withdraw the plea providing what data I would have to --

THE COURT: Go ahead.

MR. DIAMONSTEIN: In any event, if I was to stay in the case and then he wishes to withdraw his plea, and that's his, and that's what he would do, that's what -- I would obviously do so. However, in drafting such a pleading it would put me in a very awkward position to formulate the reasoning behind withdrawing the plea in light of the fact that I was the one that actually represented to him to accept the plea offer originally.

Additionally, I've been working with Mr. Tucker since -- I've done just about everything I've could have done in terms of meeting with him and going over his concerns, and certainly I have -- I mean, I wouldn't have filed competency requests and reassessment requests or gone to debriefings to try to assist him in some way if I didn't have a genuine concern for him. But obviously we were at, at this point, bipolar opposites, polar opposites, if you want to use that word, and I don't know if I can effectively continue to represent him in light of correspondences, the fact that he wants to withdraw the plea and that I would be the counsel to do so, it would put me in an awkward position, and I think down the road we may be looking at some sort of, you know, a grievance on me for not doing exactly what he may or may not have wanted.

And I certainly don't want to cause any -- I want him to be satisfied with the attorney. And we are at a position now I don't believe that he's satisfied with what I've done, and I don't think that I could continue to represent him in light of his accusations that were contained in these letters that the court has been provided a copy of. And I'd ask the court to consider my withdrawal.

THE COURT: Thank you.

Mr. Ophardt, did you have anything else in addition to what you've already provided?

MR. OPHARDT: Your Honor, regarding the motion for new counsel?

THE COURT: Yes.

MR. OPHARDT: I don't believe I've made any argument or filed anything in this, so I would request the court to indulge me for a moment.

THE COURT: Happy to hear from you.

MR. OPHARDT: Your Honor, it's a three-part test under Fourth Circuit case law. One of them was satisfied by the court today, whether or not there's been a sufficient inquiry into the relationship, the deterioration of the relationship between counsel and the defendant. Timeliness, and whether or not there's a total lack of communication I think are at issue.

The court is allowed to consider the public interest in a timely resolution of this case in determining whether or

not to allow an additional attorney. This case was indicted in March of 2012, guilty plea was entered January of this year, sentencing was originally scheduled for April. A further delay would certainly require that this not be timely resolution.

A ploy to bring about a delay has been held to be -- well, "A request for change of counsel is not just justifiable if it proceeds from a ploy to bring about a delay." That's U.S. v. Gallop 838 F.2d 105, Fourth Circuit 1988. The government would contend that this is -- although not seeking a delay, it's really a ploy to bring about a withdrawal of the guilty plea.

The colloquy with the defendant today did not show any real basis for a claim of ineffective assistance. These two individuals are clearly able to communicate. The court saw that today in Mr. Tucker's requests for certain questions to be asked by Mr. Diamonstein, and Mr. Diamonstein asked them. Mr. Tucker requested that an additional evaluation be done, and when Mr. Diamonstein, in his own independent judgment, had a basis for which to ask that, the presentence report's indication of additional evidence, Mr. Diamonstein filed that motion.

Your Honor, the requirement for the lack of communication is that the extent of the breakdown prevents the ability to mount an adequate defense. And this is where things get slightly complicated, because whether or not Mr. Diamonstein can stay in the case with a pending motion to withdraw on ineffective assistance claims kind of requires an examination of

whether or not there has been ineffective assistance and whether or not a plea could be withdrawn on that basis.

THE COURT: Should we wait until I make such a determination before we think about addressing that?

MR. OPHARDT: They are kind of dovetailed, Judge, and that's why I --

THE COURT: Okay. If you think you need to, go ahead.

MR. OPHARDT: The standard for withdrawal based on ineffective assistance is that the defense counsel's action fell below an objectively reasonable standard and that the attorney's errors -- because of the attorney's errors, there's a reasonable probability that the defendant would have chosen to face trial rather than plead guilty. The defendant had a very, had a colloquy with the court in which he entered a knowing and voluntary plea. He had a discussion with defense counsel regarding the likelihood of facing a mandatory minimum of 57 years instead of a mandatory minimum of 32 years.

I don't remember the -- first of all, I'm not sure the first prong could ever be met, but the second prong is also of difficulty. Because of that, Your Honor, I'm not sure that Mr. Diamonstein's allegation that he would have a conflict with advocating for his own ineffective assistance really exists. Mr. Diamonstein is not required to file that motion. It's not a requirement for him to file every single instruction from his defendant. He does have discretion in certain matters, and that

would be one of them.

And the government respectfully opposes the motion to withdraw.

THE COURT: Anything else?

MR. DIAMONSTEIN: I think Mr. Tucker would like to make a statement.

THE COURT: Stand up.

(Defendant and counsel conferred.)

THE COURT: Mr. Diamonstein, stand at the podium, tell me what you want to say.

MR. DIAMONSTEIN: I, I would ask the court to allow me to withdraw. And then Mr. Tucker would like to make a statement I guess in reference to some of the --

THE COURT: I've already given Mr. Tucker ample opportunity to address this issue. I'm ruling. Have a seat.

MR. DIAMONSTEIN: Yes, sir.

THE COURT: The Sixth Amendment to the Constitution protects the right of an indigent defendant to be represented by counsel. That right to counsel, however, does not entitle them to counsel of choice. The right to choose counsel is not absolute, and therefore it follows that a defendant does not have an absolute right to substitution of counsel. Generally, the fact that a defendant and counsel are not getting along is insufficient to require appointment of substitute counsel; rather, an indigent defendant can demand a different appointed

attorney only with good cause.

The criteria considered by the Court of Appeals as reflected in Mr. Ophardt's motion are the timeliness of the motion, No. 1; No. 2, the adequacy of the court's inquiry in the defendant's complaint; and 3, whether the attorney/client conflict was so great that it resulted in a total lack of communication preventing an adequate defense. And so those are the three factors that are looked at. This court considers all of those and perhaps really the totality of the circumstances in making its determination. But let me address some of those.

The Court of Appeals has considered, in looking at timeliness, whether defendant delayed in filing his motion and whether the delay has caused or will cause a delay in the proceedings. As Mr. Ophardt noted, the latter part of that is what he was referring to about the delay of the proceedings. The court can take into consideration the public interest in proceeding on schedule, and the court may consider whether a continuance resulting from appointment of new counsel will significantly impede the efficient administration of justice.

So what do we ever here? Mr. Diamonstein was appointed to represent Mr. Tucker on April 27, 2012. Less than one month later, on May 16, 2012, Mr. Diamonstein moved for a psychiatric exam to determine Mr. Tucker's competency to proceed, and his sanity at the time of the offenses. After the court granted his motion and ordered the evaluation, Mr.

Diamonstein moved, on May 23rd, 2012 to continue trial. And following the court's competency determination at the October 2012 hearing, Mr. Diamonstein then negotiated a plea agreement as to Counts 4 and 6 of the indictment. And then on December of 2012, the court entered an order authorizing a magistrate judge to conduct the guilty plea proceedings. They were conducted, and Mr. Tucker did plead guilty to Counts 4 and 6, and Judge Miller accepted that plea.

The first hint of any complaint with Mr. Diamonstein's performance came in Mr. Tucker's letter of March 6, 2013, nearly a year after representation began and well after his guilty plea hearing before Judge Douglas Miller.

Mr. Diamonstein did not move to withdraw based on the statements in Mr. Tucker's first two letters, nor did Mr. Tucker expressly request new counsel in those letters. Instead, on April 15, 2013, based on information verified in the presentence report, Mr. Diamonstein then moved to reassess Mr. Tucker's sanity at the time of the offense. He also moved to continue sentencing. That motion was granted on April 24, 2013. The court then converted Mr. Tucker's sentencing hearing to a hearing on the motion for reassessment, and the court heard from both Mr. Diamonstein and Mr. Tucker.

Mr. Diamonstein suggested that the case had a lot of ups and downs, and it was -- ups and downs in terms of whether the client was pleased with something or not pleased with

something and how things were proceeding. He pointed out that he had done his best to try to represent Mr. Tucker to the best of his ability and tried to safeguard every interest of him. Mr. Tucker, when I gave him an opportunity at that hearing to express himself, expressed great concerns regarding the evaluator's ability to fairly evaluate the new information concerning his sanity, but he did not raise any concerns about the effectiveness of his attorney/client relationship with Mr. Diamonstein during that exchange.

Now the court has the second addendum. Have taken this testimony from Dr. Pietz, and so I have the facts before me that the pending motions were filed more than a year after representation began, that it will likely delay proceedings, which is, have already been delayed by Mr. Tucker's evaluation, and the evaluator's consideration of the additional materials. And so I find that the timeliness factor appears to weigh against substituting counsel.

Now, adequacy of the court's inquiry. I have given -- let's do this first. Let's look at the standard.

When a defendant raises a seemingly substantial complaint about counsel, the judge has an obligation to inquire thoroughly in the factual basis of defendant's dissatisfaction with his attorney in order to determine whether there is good cause. That's the Fourth Circuit's standard. Ultimately, to warrant substitute counsel, a defendant must show justifiable

dissatisfaction with appointed counsel. Justifiable dissatisfaction sufficient to merit substitution of counsel includes a conflict of interest, an irreconcilable conflict, or a complete breakdown between the attorney and the defendant.

So the court's inquiry as to a defendant's dissatisfaction with counsel will necessarily overlap to some extent with its inquiry as to the third factor; that is, the extent of breakdown in attorney/client communication.

In his letter, Mr. Tucker said Mr. Diamonstein was not doing his job and is very ineffective. He contended that Mr. Diamonstein has done -- hasn't done anything to help him on his case and Mr. Diamonstein has also violated rules and conduct relating to the Bar Association.

When I gave Mr. Tucker an opportunity today to explain to me his concerns, he really was unable to add anything substantively to that, and so I -- and I cannot help but note that there seems to be a pattern to a lot of the complaints I'm receiving from the defendant. Mr. Diamonstein's motion to withdraw doesn't really provide a lot of specific factual support other than drawing from the statements that Mr. Tucker has made that Mr. Tucker apparently believes Mr. Diamonstein has not represented him adequately and is dissatisfied with his efforts to represent him, and notes that some of the allegations in Mr. Tucker's letters have no basis in fact.

I have also noted that the Court of Appeals has said

that a mere allegation that an attorney is not doing his job or is ineffective is insufficient to show justifiable dissatisfaction warranting the substitution of counsel; rather, to support a complaint, Mr. Tucker has to provide a basis for his expectations or otherwise specify what counsel should be doing that he's not doing. This is especially true in light of Mr. Diamonstein's ongoing efforts and his position that he's made every attempt to safeguard the defendant's interests.

Now the breakdown in communication allegation. The third factor. A defendant is not entitled to new counsel just because he disagrees with his attorney. That's also Fourth Circuit precedent.

Disagreement over strategy and tactics does not constitute a communication breakdown sufficient to warrant replacing counsel.

And in evaluating whether the standard is met, the court must determine whether there is a total lack of communication, and second, if such lack of communication prevents an adequate defense. A total lack of communication alone, however, is not dispositive nor required. Rather, an examination of whether the extent of the breakdown prevents the ability to conduct an adequate defense is the necessary inquiry in this circuit. This standard is met when a breakdown in attorney/client communication is so severe that it prevents even the ability to conduct an adequate defense; that is, when the

likelihood of defense counsel's providing effective assistance is so small that the court finds it to be virtually nil. When the disagreements between counsel and the defendant are merely the result of defendant's own belligerence, the court is not compelled to substitute counsel, according to this circuit's precedent.

Furthermore, a defendant's transparent ploy for delay is a proper basis for denying a request for change in counsel, or when it's a dilatory tactic.

We don't have here a suggestion by Mr. Tucker that there's been a complete breakdown in his communication with Mr. Diamonstein. Mr. Tucker's been very honest about that, I think. Other than to say -- Mr. Tucker, I should say -- other than for him to say that, from his perspective, Mr. Diamonstein hasn't done anything to help him or his case, which, frankly, in light of the diagnoses that I have here and in light of what I've seen in the hearings that we've had here, doesn't surprise me. Mr. Tucker has a propensity to be melodramatic. And I don't -- I'm not suggesting that that method of coping or dealing is not understandable in light of Mr. Tucker's background. But that is his manner of dealing and coping with his situation.

Mr. Diamonstein has pointed out that he's met with Mr. Tucker on at least 18 occasions, he's given the dates, and that he's been continually in contact with the defendant. Now, I'm sure Mr. Tucker would like to have more contact. Probably,

ideally, daily. But that's not going to happen with Mr. Diamonstein, or any other attorney. It's not realistic. And it's not what is expected of counsel. I'm looking at Mr. Tucker as I'm talking and he's shaking his head and he's looking at me like he's disappointed. That is a continual kind of acting-out that I've seen in all these hearings. And talking under his breath. And I think it's a coping mechanism, and I understand it.

Mr. Tucker, I'll say to you, I don't doubt at all that you've experienced these kind of things in your background, but I have to look at all these factors and make a determination based on the law whether the motion for new counsel is sufficiently based for me to grant that motion.

And so, you know, the other thing I would note is that Mr. Tucker has continued to be interactive with Mr. Diamonstein, from the testimony from Dr. Pietz, consulting with him every time he sat down when Mr. Ophardt was asking questions, and has consulted and has expressed, obviously, his thoughts to Mr. Diamonstein about what questions should be asked, and it's clear that they have an ability for ongoing communication. Mr. Tucker may not like the fact that he gets the results he gets from me, but that's obviously not Mr. Diamonstein's problem. And so those are my observations about that.

I don't know that Mr. Tucker's acting out and comments are necessarily an effort to delay what we're doing. I think it

may be more of just his method of coping. And it seems to me to make sense in light of what I have read in these reports and what I've heard from Dr. Pietz.

And so I find there's not a total breakdown in communication. And in essence we have belligerence, but I think it's belligerence that grows out of, perhaps, a coping mechanism. So I'm going to therefore deny the motion for new counsel.

And I'm going to say to you, Mr. Tucker -- I'm not inviting any response from you and I don't expect one -- that you should continue to try to work with Mr. Diamonstein as best you can to represent your interests, and that's how we're going to proceed.

All right. Now, this hearing has gone on now for two hours and we still need to address the report. And I think it's probably in everyone's best interest that we take a comfort break and come back and deal with these matters after that.

Counsel, do either of you have any other matters where you have to appear or are obligated this afternoon? Mr. Ophardt?

MR. OPHARDT: No, Your Honor.

THE COURT: Mr. Diamonstein?

MR. DIAMONSTEIN: No, sir.

THE COURT: Okay. Because we've had the kind of history that we've had here I just don't want to do this in a

cursory fashion. I want to be thorough and careful.

And so for the Marshals, I'm going to ask for a little bit of input. I could take a 10-minute comfort break and we could come back and probably have this done by two o'clock, or we could take our lunch break now, a one-hour lunch break and come back and then do it. I know there are various considerations, so I want to some input from you all. Would either be preferable for you?

DEPUTY U.S. MARSHAL: It's whatever the court decides.

It's whatever the court decides. If, you know, a 10-minute break is fine then come back and finish it off and use this, as you said, done by 2:00, that's fine with us. We can give him his lunch after two o'clock.

THE COURT: Okay. We'll do a 10-minute break, come back and proceed.

(Recess taken from 1:01 p.m. to 1:16 p.m.)

THE COURT: Counsel, I'm going give the defendant an opportunity to make any statement he wishes. He has, I understand, expressed a desire to do so. And so if the Marshals are content to do it, at the podium is the easiest way to do that. And so Mr. Tucker, why don't we have you step to the podium and I'll give you an opportunity to be heard.

I understand, Mr. Tucker, that you wanted to say something else, and so before we proceed, I want to give you the opportunity to do that.

THE DEFENDANT: Thank you. I'm, I'm very frustrated, because I don't, I'm do not see how you all can let Mr. Diamonstein continue to be my lawyer when this man told me that he, in his 20 years, this is his words, his 20-plus years of being a lawyer, a attorney, that he's never dealt with a case like mine, he didn't understand what he's doing. And I told this man last year information about my case that he ain't even told the U.S. Attorney that could have helped me out. And, and the letter I wrote to you, I don't understand how you all can say that I'm satisfied with my attorney when I told you I was going to kill myself in front of this man because of what he's doing because he's not doing his job. So I don't understand how you all can say I'm satisfied with him, and he not -- I'm not satisfied. I'm not, I'm not satisfied with him, and it ain't no -- just like table when the doctor was on the phone, he tried to -- I had to raise my voice to him. That man wasn't going to ask her the last question. He tried to say no, but I told him he be my lawyer, he ain't got no choice but to do it. The man don't wanna -- he's not doing his job. He's not going his job, man. Like he said earlier before we came in the courtroom this morning, that clear he's, clearly there's no, there's no, no communication between us. The man doesn't -- I don't remember, I don't recall him coming to see me 19 times. He don't write me like he's supposed to write me. As a matter of fact, he don't write me period. It took this man three weeks to send me a

order that been put in. This man, he ain't doing his job, and I don't understand how you all can continue to let this, let him be my lawyer.

And the man -- I don't know, he's not -- I'm not satisfied with him. I, I didn't know that I was supposed to write that I wanted a new attorney. I put it in, in different -- somebody else told me to do it the way I did it, to write to get a new attorney, but the way I did is just how it is about him not doing his job. I didn't know that I was supposed to write that I want a new attorney, I just told you, I said in the letter to you that he wasn't doing his job and that -- and everything else, so I thought that would have been clear enough.

THE COURT: All right. Mr. Tucker, you understand that I disagree, obviously, and I know you're not happy about it, but as I said in my ruling -- and nothing you've said here changes my viewpoint on this -- I frankly don't think that another attorney is going to change anything. No. 1, the fact that Mr. Diamonstein may have told you that in 20 years of practice that he hasn't -- listen to me, Mr. Tucker.

THE DEFENDANT: I'm listening.

THE COURT: The fact that in 20 years of practice he hasn't had a case exactly like yours is not something that surprises me. You have a very unique set of circumstances in that you have all of this background that we've been discussing today of things that have happened to you, and we have three

separate robberies here. So you know, there's a unique set of circumstances. So that doesn't surprise me. Do you understand that? Doesn't surprise me.

No. 2. You talked a little bit about the fact that you gave him information that he hasn't, you think he should have passed on to the government. You know, he said earlier that, you know, he gave full consideration to this issue of, you know, what are the chances of you prevailing, of you being found not guilty before a jury versus pleading guilty to lesser charges. You had the possibility -- Mr. Tucker, listen.

You had you the possibility for 57 years just on the gun charges. Just on the gun charges in the indictment. Not even taking into account all of the time -- you could have been in prison for life -- on the robbery charges. There are three separate robberies here. You had all of that facing you. All of that facing you. Mr. Diamonstein had to look at everything and decide what is the best case, what is the best that he could do for you. And obviously you all had a discussion and you answered all of Judge Miller's questions indicating that you agreed with going forward in that manner. So it doesn't, it doesn't surprise me.

Okay. Go ahead. You've got your hand up.

THE DEFENDANT: And the letter, I, I, when I was in the courtroom when I signed my plea, all those questions that Judge Miller asked me, he didn't go over with me. You can ask

him how many times I had to stop in the middle of the thing to speak to him about it. And that's up to a jury to decide if I'm guilty or not. I'd rather take my chances with them, because this, that -- I didn't do what, I did not do my crime willingly. I didn't do it. I was forced to do it. And he didn't take that into consideration. He didn't take that into consideration at all. I don't think he did. And I'm, if he -- no.

THE COURT: You told me earlier you received some text messages during the course of these robberies, and I'm sure that Mr. Diamonstein considered that. And he considered the interactions that you had with your brother before the robberies took place in ultimately advising you. But it was your decision how you wanted to proceed, and you decided you wanted to proceed with the guilty plea.

THE DEFENDANT: The man think I'm incompetent. He already done told me -- man, it's -- he, he took it upon his word to -- it's my choice of whether I, I want to go to trial or if I want to plead guilty. This man didn't take into consideration of what -- man, he -- let me find the words. If -- man...

THE COURT: Take your time, Mr. Tucker.

THE DEFENDANT: That man, Mr. Diamonstein, did not take into consideration about whether or not...

Oh, my God...

THE COURT: Let me stop you for a second while you're

searching for the right words.

He asked that you be evaluated -- he was trying to act in your best interest. He asked that you be evaluated.

THE DEFENDANT: He did?

THE COURT: Well, why --

THE DEFENDANT: No, I'm not saying --

THE COURT: Why do you think you went and got evaluated, Mr. Tucker?

THE DEFENDANT: If he acted in my best interest he wouldn't have waited nine months for to put in another motion to get me reassessed when I told him when I first came back to Virginia that the evaluation was messed up. He should have did it back then, not nine months later. I told him when I first came back to Virginia that the evaluator, all of that, it don't take nine months to put in no -- I'm pretty sure it doesn't. I told him way back then.

THE COURT: Mr. Tucker, Mr. Diamonstein has lots of cases. You're not the only person he represents.

THE DEFENDANT: So we're taking --

THE COURT: You have unreasonable expectations. And that's the bottom line. And I think no matter who is representing you that you're going to have these kind of issues. I just think that's part of how you, you know, you kind of cope with things. So you and I are clearly going to disagree, okay? Listen to me. You and I are clearly going to disagree. But

what you have to do now is calm down and focus on working with Mr. Diamonstein as we move forward.

THE DEFENDANT: The man don't understand me. He don't, he's not going to -- it's --

THE COURT: Nobody's going to understand you the way you want them to understand you. I'm convinced of that.

THE DEFENDANT: No, no, see --

THE COURT: Okay. We're --

THE DEFENDANT: I can't do this, man. You all cannot sit here and tell me that I'm satisfied with this man if I tell you I'm not satisfied with him. If I tell you that in a letter that I'm going to kill myself in front of my lawyer, how can you say I'm satisfied with him? Just because you think I'm satisfied with him don't mean I'm satisfied with him. If I tell you I'm not satisfied with him, you can't sit there and go against what I say. If I'm not satisfied with him, I'm not satisfied with him.

THE COURT: Okay. You're not satisfied with him.

THE DEFENDANT: The man ain't doing his job.

THE COURT: I believe you're not satisfied.

You can have a seat back at counsel table down at the end there.

(Defendant speaking loudly to Mr. Diamonstein.)

THE COURT: Mr. Tucker, please be quiet. Please be quite.

THE DEFENDANT: It's unjust what you all doing, man. People get away with putting guns to my head and stuff...

THE COURT: Mr. Ophardt --

Mr. Tucker, if you're not quiet, you're going to go out and we're going to continue with the proceedings. If you want to stay here and find out what's going to happen, you'd better be quiet. So stop talking.

Mr. Ophardt, I'm happy to hear from you about anything else you would like to say about how we proceed.

MR. OPHARDT: Your Honor, I believe the concerns raised in the defendant's motion for an additional mental health evaluation have been addressed through the submission of the additional documentation to the BOP evaluator. I do not believe additional evaluation would be warranted at this time and that we can proceed to sentencing at the court's discretion.

I believe Mr. Diamonstein has informed me that he will be filing a motion to withdraw the guilty plea. I'm not sure how that will affect the court's time table.

If the court has any questions for me, I'll be happy to answer them at this time.

THE COURT: All right. I just wanted to give you the last opportunity, unless Mr. Diamonstein has anything else he feels the need to say.

MR. DIAMONSTEIN: Nothing further, Judge. We will be filing a motion to withdraw the guilty plea at some point.

THE COURT: All right. Based upon everything that I heard from Dr. Pietz, based upon all of my observations here, I am prepared to move forward on the motion to reassess sanity.

The court did order the evaluator to address the sanity and competency issues and they have been fully addressed both in the report; that is, the second addendum, and in the testimony via telephone before the court today.

As the court has noted before, if, after the hearing -- this is the standard set out in 4241(a) through (d) in Subsection D, "If after the hearing the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General."

The Court of Appeals in this circuit has said in making the competency determination, the court must decide whether a defendant has sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding, and whether she has a rational as well as factual understanding of the proceedings against her. A court must find a defendant incompetent if it determines by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering her incompetent to the extent

that she is unable to understand the nature and consequences of the proceedings against her, or to assist properly in her defense. Indicia of competence can include a defendant's behavior, her demeanor at trial, and any medical opinion on competence. And that's summarizing the various standards from U.S. v. Robinson and U.S. v. Mason, and the court's later appendix decision in U.S. v. Locke in 2008.

Of course if the court were to find the defendant incompetent, he would have to be housed in a mental health hospital until certain things took place.

The July 2012 forensic report addressed the issue of whether Mr. Tucker was competent, of course, and it addressed first whether he currently suffers from a mental disease or defect, and second whether that mental disease or defect prevented him from being able to understand the nature and consequences of the legal proceedings against him or from assisting properly in his defense.

On the first question, the report concluded Mr. Tucker does meet criteria for borderline personality disorder, which is his primary diagnosis, and then stated that based on his self-reported history, it's possible that Mr. Tucker meets criteria for post-traumatic stress disorder. And then she noted that this diagnosis was not presently verified and we offer it with limited degree of certainty, and stated that Mr. Tucker does not appear to be meet criteria for a psychotic disorder.

In reaching these diagnoses, the report relied on personal history provided by Mr. Tucker; his criminal history is obtained from indictment records, medical summaries and records and other investigative materials provided by the U.S. Attorney and defense counsel, medical summary records and mental health records from Hampton Roads Regional Jail and Western Tidewater Regional Jail, observation of Mr. Tucker through his hospital course at the mental health evaluation unit, which, according to the earliest reports, the earlier forensic report, the dates of evaluation were June 14 to July 26, 2012.

Also relied on observations of him throughout his hospital course in the mental health evaluation unit and the competency interview, including the administration of the MMPI-II. Both Mr. Tucker's statements and the corroborating information showed Mr. Tucker's long history of difficulties beginning with a reported suicide attempt at age seven, and observations of Mr. Tucker throughout the course of his stay at the unit documented several outbursts and other episodes requiring the use at one point of four-point soft restraints and suicide watches to ensure his safety.

During this period, the report concludes that Mr. Tucker continued displaying smiles incongruent to his contextual situation, demonstrated low tolerance for daily frustrations. His mood fluctuated between irritability and euthymia, e-u-t-h-y-m-i-a, and he displayed demanding and

attention-seeking behaviors. He was consistently organized and logical in his thoughts. He evidenced no signs of psychosis and no overt signs of delusions. He maintained adequate hygiene. He was selectively receptive to feedback and education efforts about proper behavior, impulsivity and credibility in his reports. The primary barrier to education was Mr. Tucker's minimization of personal responsibility for his disruptive behavior. That was at Pages 7 through 8 of the report.

Now, in evaluating Mr. Tucker's mental status, the report concluded that all of his self-harm behavior while at the facility has been for secondary gain and found him to be at low risk of self, for self-harm at the time of its writing. The MMPI-II resulted in a valid profile showing many symptoms of thought disfunction and ideas of persecution and reporting his highest two clinical scales as hypochondriasis and schizophrenia, but the report noted that Mr. Tucker's pattern of responding is similar to those who have a tendency to overreport psychological difficulties and warns that his MMPI-II findings should be interpreted with caution.

According to the DSM-IV-TR, Mr. Tucker's primary diagnosis of borderline personality disorder specifically characterized by a long-standing pattern of instability in interpersonal relationships, self-image and affect.

Additionally, an individual, according to this report from Dr. Pietz, can demonstrate marked impulsivity beginning in

early adulthood and present in a variety of contexts. The report cites Mr. Tucker's early onset difficulties and self-damaging and impulsive behavior in coping with difficult situations and his unstable self-image, his unstable and intense interpersonal relationships, and his threats to self-harm, and his affective instability due to a marked reactivity of mood and his feelings of emptiness and ability to experience stress-related paranoid ideation.

Considering all of the above information, observations, test results and diagnoses, the report ultimately concluded Mr. Tucker does not appear to meet the threshold of mental disease or defect necessary for an individual to be found not competent to stand trial.

Now, as to the second question, whether a mental disease or defect prevents Mr. Tucker from being able to understand the nature and consequences of the legal proceedings against him or from assisting properly in his defense, the report considered the lengthy discussion with Mr. Tucker regarding the charges and the legal process before ultimately concluding that, "Mr. Tucker has a sufficient rational and factual understanding of the charges against him and how the legal process relates to his specific situation." The report noted Mr. Tucker's apparent willingness to assist his attorney in his defense, and further found at that "Mr. Tucker is not experiencing symptoms of a mental illness such as psychotic

thinking that would prevent him from being able to work with his attorney."

The report also commented "It is our opinion that Mr. Tucker is competent to proceed. We have no reason to believe that he does not possess the ability to control his behavior in the courtroom, to work with his attorney, or to rationally discuss his legal case. While Mr. Tucker may possibly meet symptomatic criteria for post-traumatic stress disorder by history, it not does not impede his rational and factual understanding of the charges and possible consequences against him. Mr. Tucker is also able to effectively assist in his defense should he choose to do so."

And so it was based upon these reports, these findings that the court initially concluded that the defendant was competent to proceed, and the court made its findings based upon the information that it had at that time. Now we have all of the information in the addendum, and the addendum information concluded that the sanity determination was not affected by the additional information we provided. The forensic psychologist explained today that competency is a real-time determination, and so that determination cannot be made based upon the information that she had been provided additionally, but that she saw nothing that caused her to second-guess the sanity determination that was, of course, a component, a threshold component of the competency determination as she described that

interaction.

And so I see nothing here that causes me to change my prior conclusion that the defendant is competent, and the sanity determination, of course, is something that we don't have to get to. The defendant has pled guilty. If he later decides he wishes to seek to withdraw and if the court were to allow him to withdraw the guilty plea, then that might ultimately be a question for a jury, as the court noted at its last hearing.

Now the court also makes a couple other observations that sort of bleed over from the, this determination on competency into some of the prior, into the earlier motion, I should say, on counsel.

Mr. Diamonstein has been very careful with the court to point out Mr. Tucker's dissatisfaction. Mr. Diamonstein has appeared before this court many times, many times over the past 10 years, actually: The five years when the court was on the Circuit Court, State Circuit Court, and then the five years the court has been here in this court. Always found Mr. Diamonstein to be very careful. Notably, one thing that I think that is of particular benefit here is that Mr. Diamonstein has a calm, very, very calm demeanor. Mr. Diamonstein has a -- he may not like this, but a soothing voice. A soft and soothing voice. It seems to me that some of the challenges that we have -- and I don't question any of these challenges that Mr. Tucker faces and that he has faced -- but in light of these challenges it seems

to me Mr. Diamonstein is exactly the right kind of person to press Mr. Tucker's case for him. I know Mr. Tucker disagrees with that, he has stated that vehemently today, but the court has not agreed with Mr. Tucker, so that's, there's no secret there. But I just, I feel constrained to comment that I see those qualities that are of great benefit here in Mr. Diamonstein. And he's been doing this for many years, and I have absolutely no reason to question the care with which he has approached the case, the great thought he's given, or the fact that he will proceed appropriately in the case.

Now, where does that leave us? That leaves us with Mr. Diamonstein's statement that Mr. Tucker wishes to withdraw his guilty plea and a motion is going to be filed.

Mr. Ophardt, remind me again, how long, how much longer are you down in this district? I know you're tired of my asking that.

MR. OPHARDT: Not long enough, Your Honor. I am in trial next week, and that will be my last week. My replacement will be here on the 15th of July and taking over this case.

THE COURT: Okay. I'm going to do something a little unusual. I'm going to kind of talk for a few minutes about the standard that will apply should a motion to withdraw be filed.

I'm going to order that the transcript of the proceeding be prepared as a result of today's hearing so that it's all there for the future should we need it.

So, federal Rule of Criminal Procedure 11(d)(1) provides that a defendant may withdraw a plea of guilty before the court accepts the plea for any reason or no reason. In addressing a magistrate judge's authority to conduct guilty plea proceedings pursuant to Rule 11, the Fourth Circuit has held that Rule 11(d) is no longer applicable following a plea before a magistrate judge because magistrate judges possess the authority to bind defendants to their plea for purposes of Rule 11 so long as district judges retain the authority to review the magistrate judge's actions *de novo*. That was in U.S. v. Benton in 2008. Such authority derives from the Additional Duties Provision of the Federal Magistrate's Act, which provides that a magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States. In recognizing this authority, the Fourth Circuit expressly rejected the argument that a magistrate judge's constitute merely proposed findings and conclusions of law as to a plea acceptance. To hold otherwise would grant defendants a dry run or dress rehearsal, a procedure in which a defendant can agree to plead before a magistrate judge and then withdraw that plea without any complaint that the Rule 11 hearing was deficient in any way. The Fourth Circuit emphasized the practical consequences of permitting such withdrawals. They said in Benton, "This, of course, risks rendering plea proceedings before magistrate judges meaningless," citing U.S.

v. Hyde from the Supreme Court, noting in a slightly different setting, that, "Were withdrawal automatic in every case for any reason, the guilty plea would become a mere gesture, a temporary and meaningless formality."

The Fourth Circuit went on. "In cases where a defendant withdraws his plea for no reason, the proceedings before the magistrate judge will have been rendered a nullity; a complete waste of judicial resources. In fact, making Rule 11 hearings non-binding may encourage defendants to use magistrate-lead colloquies as go-throughs in order to gauge whether they may later experience buyer's remorse."

Now, because district courts retain the authority to conduct a *de novo* review of any substantive or procedural concerns raised regarding a defendant's plea proceeding before a magistrate judge, a defendant having consented to participate in such a proceeding may not withdraw his plea for any or no reason. Rather, the substantive rule of decision is whether the defendant has established a fair and just reason to withdraw his plea after the magistrate judge has accepted it. Thus, based on the procedural history of this case, you have to consider the question, if this motion is filed, of whether Mr. Tucker would be free to withdraw his plea of guilty, and of course as I've just stated for any or no reason, it would appear that would be a significant obstacle.

Mr. Tucker, it would seem, may only withdraw his

guilty plea if the court rejects the plea agreement under Rule 11(c)(5), No. 1; or 2, defendant can show a fair and just reason for requesting the withdrawal. The Fourth Circuit has held that a fair and just reason for withdrawing a plea is one that essentially challenges either the fairness of the Rule 11 proceedings, wherein the defendant tendered and the court accepted the plea or the fulfillment of a promise or condition emanating from the proceedings. As the court said in U.S. v. Bowman, Fourth Circuit said "A fair and just reason would obviously include defective plea proceedings before a magistrate judge." The Fourth Circuit has recognized the heavy burden that a defendant has when seeking to demonstrate the existence of such a reason. They said in U.S. v. Thompson-Riviere in 2009, Because of the grim dynamics of plea bargaining, including the prevalence of buyer's remorse among those who have pled, a district court should not interpret Rule 11(d)(2)(B) to allow a defendant to withdraw a guilty plea simply on a lark after it conducts a thorough plea colloquy and has made the requisite findings. Therefore, where a properly conducted Rule 11 guilty plea colloquy has occurred, a defendant has, as the court said in Bowman, a very limited basis upon which to have his plea withdrawn.

Now, in determining whether the defendant has carried such a heavy burden to show that withdrawal is warranted, the Fourth Circuit has articulated a list of non-exclusive factors

for the district court to consider. Those factors are, whether the defendant has offered credible evidence that his plea was not knowing or not voluntary; two, whether the defendant has credibly asserted legal innocence; three, whether there has been a delay between entry of the plea and the filing of the motion; four, whether the defendant has had close assistance of competent counsel; five, whether withdrawal will prejudice the government; and six, whether withdrawal will inconvenience the court and waste judicial resources.

The Fourth Circuit has noted that the consideration of these factors is not a rigidly mechanistic test, for the conspicuous fuzziness of the operative terms "fair and just" would preclude such an endeavor. Instead, the Fourth Circuit recommends that a district court balance these factors along with any other pertinent information to reach its decision. But ultimately, the decision to permit the defendant to withdraw a plea is discretionary, and the review by the Court of Appeals is limited to the question of whether or not the court, the district court abused its discretion.

So I offer that all up and I ask everyone involved to give careful consideration to what would have been faced had the matter not gone to a guilty plea and what all the relative risks and benefits are.

Madam Clerk?

(Court and courtroom deputy conferred.)

THE COURT: I also am going to, I think out of an abundance of caution, and because I want, I may want to have that at a later time in any case, I'm going to order preparation of the guilty plea colloquy conducted by Judge Miller, and will ask that the court reporter see to that. I guess we need to have Mr. Diamonstein submit the form and then I will need to sign it. So Mr. Diamonstein, will you prepare the form requesting the preparation of that transcript, and I will then sign that and have that colloquy prepared so we can go back and have that.

Mr. Ophardt, do you have anything else we need to address today?

MR. OPHARDT: No, Your Honor.

THE COURT: Mr. Diamonstein, is there anything else you would like to address?

MR. DIAMONSTEIN: Nothing further, Your Honor.

THE COURT: All right. Thank you all for your presentations.

(Whereupon, proceedings concluded at 1:53 p.m.)



CERTIFICATION

*I certify that the foregoing is a true, complete and correct transcript of the proceedings held in the above-entitled matter.*

Digitally signed by Paul McManus
Date: 2013.07.23 11:30:24 -04'00'
______________________________

Paul L. McManus, RMR, FCRR

___________

Date